[Crim. No. 33206. Second Dist., Div. Four. Feb. 2, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK ANGELO MILANO et al., Defendants and Appellants.

154

## COUNSEL

James Edward Green for Defendants and Appellants.

George Deukmejian and Evelle J. Younger, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Janelle B. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

ALARCON, J.—Defendants have appealed from judgments of conviction for attempt to violate Penal Code section 337i (dissemination of gambling information). Defendants were jointly charged with attempted dissemination of gambling information in violation of Penal Code sections 664 and 337i and bookmaking in violation of Penal Code section 337a. As to each defendant, motions under Penal Code section 995 were granted with respect to charges of violation of Penal Code section 337a, and those charges were dismissed.

Prior to their respective trials, each defendant moved the court to dismiss the information on the ground that Penal Code section 337i was unconstitutional. Each motion was denied.

Defendant Callahan was tried by a court, trial by jury having been waived, and was found guilty of attempted dissemination of gambling information.

Defendant Plotkin was tried by a court, jury having been waived, and was found guilty of attempt to violate Penal Code section 337i, dissemination of gambling information.

Defendants Cuccia and Milano were jointly tried by court, jury trial having been waived, and were each found guilty of attempt to violate Penal Code section 337i, dissemination of gambling information.

Although three separate trials were held, the issues in each were remarkably similar and much of the evidence was identical. The testimony of Sergeant Dahler, of the Los Angeles Police Department, given during the Callahan trial, was, pursuant to stipulation, introduced by way of transcript into the Milano, Cuccia and Plotkin trials. In addition, most of the exhibits introduced in the Callahan trial were also used in evidence against the remaining three defendants. Similarly, the contentions on appeal concerning the constitutionality of the statute and its enforcement are raised by all four appellants.

*Issues on Appeal*

1. Penal Code section 337i is unconstitutional in that it is vague and overbroad and therefore infringes on the right of free speech;

2. Penal Code section 337i violates defendants' right to equal protection, in that the news media is expressly exempted from prosecution thereunder;

3. Defendants were subjected to discriminatory enforcement of that statute against them; and

4. There was insufficient evidence to support two of the four convictions.

*Summary of Facts*

The evidence established that each of the appellants operates a service disseminating information to subscribers. For a fixed fee, (in the Callahan case $25 per week) a subscriber may telephone a number provided by appellant and receive information concerning sporting events. For example, appellant Plotkin provided information concerning horse races. A subscriber would be informed of the post time of a race, late scratches, parimutuel payoffs, results of races, daily double payoffs, etc. Appellants

Cuccia and Milano also provided information concerning horse races. Appellant Callahan provided information on baseball and football games. There was no evidence that any of the appellants accepted or offered to place wagers on any of the sporting events covered by their services, and as previously noted, charges of wagering were dismissed against all defendants.

The specific evidence against each defendant will be discussed in greater detail in the analyses of sufficiency of the evidence which follow.

### Sufficiency of the Evidence

Penal Code section 337i provides as follows:

"Every person who *knowingly* transmits information as to the progress or results of a horserace, or information as to wagers, betting odds, changes in betting odds, post or off times, jockey or player changes in any contest or trial, or purported contest or trial, involving humans, beasts, or mechanical apparatus by any means whatsoever including, but not limited to telephone, telegraph, radio, and semaphore when such information is transmitted *to or by a person or persons engaged in illegal gambling operations,* is punishable by imprisonment in the county jail for a period of not more than one year or in the state prison.

"This section shall not be construed as prohibiting a newspaper from printing such results or information as news, or any television or radio station from telecasting or broadcasting such results or information as news. This section shall not be so construed as to place in jeopardy any common carrier or its agents performing operations within the scope of a public franchise, or any gambling operation authorized by law." (Italics added.)

Appellant Plotkin contends that there is insufficient evidence to support a finding that he disseminated information concerning horseracing activities to persons who he knew were engaged in illegal gambling operations. Appellant Callahan contends that there is insufficient evidence to support his conviction for knowingly transmitting information regarding football and baseball games to persons engaged in illegal gambling activities. The following evidence was introduced against each of said appellants relative to the issue of knowledge.

(a)  *Plotkin*

■   On July 7, 1977, Officer Karen Clarke of the Los Angeles Police Department dialed telephone number 877-7142 and spoke to defendant Plotkin. She identified herself as "Annie." She expressed an interest in defendant's service and he instructed her to mail to him $25 per week cash and thereafter to call in as frequently as she wanted every day and identify herself as "Mary." He gave her directions concerning how frequently she should call during the day in order to get precise post times and race results.

The officer began placing regular calls to the telephone number provided until July 22, 1977. She often called several times an hour throughout the day. On each call she was provided with race results and post time information.

Officer Dahler, whose expertise in bookmaking was stipulated to in each of the trials, testified that precisely accurate knowledge of the post time of each race is extremely important to bookmakers. If a race were to begin prior to the scheduled post time, which frequently happens, a bookmaker could take a bet from a bettor on a race which had already begun. The bookmaker would then be "past-posted," something considered a serious danger to bookmakers.

During the first conversation between Officer Clarke and defendant Plotkin, defendant asked her: "[D]o you take the east?" Later in another conversation he asked, "You take all of Belmont, right?"

In that connection, Officer Dahler testified that those questions have a particular meaning within the bookmaking community. He explained that defendant was asking whether Officer Clarke accepted wagers on all of the races at Belmont or on any of the tracks back east.

During the transmission of information in one of the early calls from Officer Clarke, defendant stated: "The second is 6, 3, 7. And there's no prices yet. And lock up. The fifth is already gone, . . ." Officer Dahler testified that in bookmaking terminology, "lock it up" means but one thing: "To close off the race." It is an instruction to the bookmaker to take no more bets on that race. On two other instances, defendant instructed Officer Clarke to "lock 'em all up."

On July 22, 1977, Officer Clarke and defendant discussed how much longer the races would be running at Belmont. The officer stated to defendant: "Ok, well, I think, I don't really have enough action to make Belmont worthwhile for me, so I'm just gonna just start taking Hollywood after today." Defendant responded: "Well, whatever you need honey, if you need anything from Belmont, I'll have it right here anyway." Officer Dahler testified that "action" means "bets" in bookmaking circles.

As the foregoing summary of the evidence clearly demonstrates, there is substantial evidence to support the conclusion of the trier of fact that defendant believed that he was providing information to a bookmaker. Viewing the evidence in the light most favorable to the People and indulging in every presumption in favor of the judgment (*People* v. *Sweeney* (1960) 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049]) we conclude that there was sufficient evidence to support the conviction of defendant Plotkin.

(b) *Callahan.*

■ With respect to defendant Callahan, the evidence in support of knowledge is virtually nonexistent. On June 13, 1977, Officer Clarke telephoned defendant. She inquired about his service and was informed that she could call the phone number provided for baseball and football information for a sum of $50 per week, ". . . as long as you're not a bookmaker, bettor or going to use it for illegal purposes." The officer answered, "Oh, I see." Defendant repeated, "Alright, [*sic*] do you understand it's not to be used for illegal purposes?" The officer answered, "Uh, huh." On each occasion that the officer telephoned the defendant's place of business, she heard a transcription of a tape, which always began: "This information is not to be used for illegal purposes." Officer Clarke testified that at no time did she inform defendant Callahan that she was a bookmaker or that she intended to use the information for illegal purposes. During cross-examination, defense counsel asked Officer Clarke, "Isn't it true that you thereafter refrained from telling him outright that you were engaged in illegal gambling for fear you wouldn't get the information?" [¶] "A. I wasn't exactly afraid, but I assumed that if I told Mr. Callahan, 'I'm your local bookmaker,' that he would probably hang up on me." [¶] "Q. He probably wouldn't give you the information? Was that your testimony?" [¶] "A. I doubted it, yes."

Officer Clarke testified that she hinted to defendant Callahan that she was a bookmaker. The transcript of one of the conversations between

Officer Clarke and defendant reflects that the officer explained having brought defendant two bottles of champagne as follows: "Well, actually, my boss has been real pleased with everything and like the line's been great, so . . ." That statement is the only one cited by the respondent as an example of a "hint" given to defendant, and our review of the record discloses no others.

While it is possible that that statement to defendant could arouse in him a suspicion that the officer was in fact a bookmaker or employed by a bookmaker, it does not qualify as substantial evidence to support a conclusion of knowledge on the part of defendant. The California Supreme Court in 1971, in a unanimous decision, found that there was insufficient evidence to support the conclusion that defendant knew that tablets in his car were restricted dangerous drugs. The court stated (*People* v. *Williams,* 5 Cal.3d 211 at pp. 216-217 [95 Cal.Rptr. 530, 485 P.2d 1146]): "There is no question that the evidence in this case could form the basis for a strong suspicion of defendant's guilt. However, as we emphasized in *People* v. *Redmond, supra,* 71 Cal.2d 744 [*sic* (745)], 755 [79 Cal.Rptr. 529, 457 P.2d 321], 'Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact. [Citations.]' (Accord *People* v. *Cook,* 275 Cal.App.2d 970, 974 [80 Cal.Rptr. 528].)" The most that can be said of the evidence against defendant Callahan with respect to this element of the offense, is that it raises a suspicion of his guilt. This being insufficient to support his conviction, it must be reversed.

*Constitutionality of*
*Penal Code Section 337i*

Appellants contend that the statute in question is unconstitutionally infirm in that it is overbroad and inhibits protected speech. It is argued that the statute therefore violates the appellants' First Amendment rights to freedom of speech. Certainly a statute which interfered with an individual's opportunity to engage in free expression guaranteed by the First Amendment would be suspect. (See *N. A. A. C. P.* v. *Button* (1963) 371 U.S. 415, 438 [9 L.Ed.2d 405].) However, not all speech is constitutionally protected. "At the outset we reject the view that freedom of speech and association *(N. A. A. C. P.* v. *Alabama,* 357 U.S. 449, 460), as protected by the First and Fourteenth Amendments, are 'absolutes,' not only in the undoubted sense that where the constitutional protection exists it must prevail, but also in the sense that the scope of that

protection must be gathered solely from a literal reading of the First Amendment.[10] Throughout its history this Court has consistently recognized at least two ways in which constitutionally protected freedom of speech is narrower than an unlimited license to talk. On the one hand, certain forms of speech, or speech in certain contexts, has been considered outside the scope of constitutional protection.[11] [Fn. 11 omitted.]" The court's footnote 10 states in part: "That view, . . . of course cannot be reconciled with the law relating to libel, slander, misrepresentation, obscenity, perjury, false advertising, solicitation of crime, complicity by encouragement, conspiracy, and the like, . . ." (*Konigsberg* v. *State Bar* (1961) 366 U.S. 36 at pp. 49-50 [6 L.Ed.2d 105, 116, 81 S.Ct. 997].)

The United States Supreme Court reiterated this proposition in *Chaplinsky* v. *New Hampshire* (1942) 315 U.S. 568 at pp. 571-572 [86 L.Ed. 1031, 1035, 62 S.Ct. 766]: "There are certain well defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any constitutional problem.[3] These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words . . . . It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly out-weighed by the social interest in order and morality. [Fn. 3 omitted.]"

In addition, California courts have long recognized that pure speech can be criminal, and it is no defense to a prosecution under a statute which makes speech a crime to allege that the First Amendment is thereby violated. For example, in *People* v. *Gordon* (1975) 47 Cal.App.3d 465 [120 Cal.Rptr. 840], defendant was convicted of violation of Penal Code section 653f, solicitation to accept a bribe. The court explained at page 474: "Penal Code section 653f is not as defendant contends, an unconstitutional infringement by the Legislature on freedom of speech. It is, instead, a valid exercise of the police power in preventing the harm which would result if the inducement proved successful and in protecting inhabitants of this state from being exposed to inducements to commit or join in the commission of crime. [Citations omitted.]"

In *People* v. *Davis* (1968) 68 Cal.2d 481, at page 486 [67 Cal.Rptr. 547, 439 P.2d 651], the California Supreme Court observed: "As emphasized in *Cox* v. *Louisiana* (1965) 379 U.S. 536, 553-555 . . . , illegal conduct is not protected merely because it is in part initiated, evidenced, or carried

out by language." ■ Appellants' contentions that the statute is overbroad, vague, and indefinite and therefore constitutionally infirm are all grounded in the premise that the statute prohibits constitutionally protected speech. Our rejection of this contention is consistent with the conclusion reached in numerous other jurisdictions which have analyzed the constitutionality of similar statutes.

In *State* v. *Ucciferri* (Fla. 1952) 61 So.2d 374, the Florida Supreme Court considered a statute substantially similar to Penal Code section 337i. The court considered the appellant's allegation that the statute violated his right of free speech. The court observed: "If furnishing information about horse racing or bookmaking falls in that category [acts injurious to public morals] it [the Legislature] may resort to such means as are reasonable and within constitutional limitations to suppress it." (*State* v. *Ucciferri, supra,* at p. 375.) The court concluded that the statute was a reasonable exercise of police power and not violative of free speech as guaranteed by the state or federal Constitution.

To the same effect see *United States* v. *Kelley* (S.D.N.Y. 1966) 254 F.Supp. 9 at page 15; *Truchinski* v. *United States* (8th Cir. 1968) 393 F.2d 627, 634; *Opinion of the Justices* (Mass. 1967) 229 N.E.2d 263, 265, 266.

In *United States* v. *Kelley, supra,* 254 F.Supp. at page 14, the defendant argued that 18 U.S.C. § 1084 [a federal statute prohibiting the dissemination of information concerning gambling] was unconstitutional as violative of the First Amendment. The court stated at pages 14-15: "The count, and the statute upon which it is predicated, 18 U.S.C. § 1084, insofar as it seeks to make it a federal crime to transmit in interstate commerce 'information assisting in the placing of bets or wagers,' attempts to punish the utterance of speech which does not create a clear and present danger of bringing about a substantive evil which Congress may constitutionally punish. Judge Wyatt, in this district, rejected the present argument in United States v. Borgese, 235 F.Supp. 286, 295-296 (S.D.N.Y. 1964). It was noted in *Borgese* that while gambling per se is not violative of federal law, it is contrary to the law of the state of New York. New York Const., Art. 1, § 9; New York Penal Law, §§ 970 through 998. The use of interstate facilities to further the commission of illegal activities, whether those activities be federal or purely state in nature, is within the regulatory power of Congress. See generally Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). The 'substantive evil' sought to be curtailed is the use of a federally controlled means of communication to violate state penal statutes. This being the case, the

provisions of Section 1084 do not trespass on the first amendment guarantee of free speech. United States v. Borgese, supra."

The evil sought to be prevented here is gambling. California has long recognized that the prohibition of gambling is a proper exercise of police power. In *People* v. *Sullivan* (1943) 60 Cal.App.2d 539, 541 [141 P.2d 230], the court considered a statute limiting horse race betting to on-premises betting at race tracks only. The court recognized ". . . the police powers of the state to legislate to protect the people in their health, safety, morals and general welfare 'in respect to those vocations which minister to and feed upon human weaknesses, appetites, and passions,' the reasonable regulation or prohibition of which come within the police powers of the states and are not prohibited by any clause of the Constitution. (*L'Hote* v. *New Orleans,* 177 U.S. 587 . . . ; *Barbier* v. *Connolly,* 113 U.S. 27 . . .)"

We find that Penal Code section 337i is a reasonable exercise of police power and a proper prohibition of speech which is itself criminal. Therefore, applying the test as reiterated in *People* v. *Davis, supra,* 68 Cal.2d at pages 483-484, we conclude that the statute is not constitutionally infirm: "The familiar rules are that statutes are to be given a reasonable and common sense construction which will render them valid and operative rather than defeat them [citations] and that if ' "the terms of a statute are by fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution, the statute will be given that meaning, rather than another in conflict with the Constitution" ' [Citations.]"

### Discriminatory Enforcement

■ Appellants introduced considerable evidence in support of their contention that the statute is being discriminatorily enforced against them. The People's expert witness, Sergeant Dahler, testified that he participated in the drafting of the proposed legislation which ultimately became Penal Code section 337i. He also testified that he has participated in every arrest under that statute by the Los Angeles Police Department since its enactment and that all of the arrests have involved the appellants herein or their employees or employers.

Evidence was also introduced concerning the numerous arrests of appellants by the Los Angeles Police Department and the efforts by the Los Angeles Police Department to have the Public Utilities Commission remove all telephone facilities from appellants' places of business.

It is appellants' contention that the Los Angeles Police Department has embarked upon a program of intentional and purposeful discriminatory enforcement of this penal statute against each of them and that reversal of their conviction is required pursuant to *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356 [30 L.Ed. 220, 6 S.Ct. 1064].

In California, the defense of discriminatory enforcement was recognized in *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286 [124 Cal.Rptr. 204, 540 P.2d 44]. There the California Supreme Court held that defendants were entitled to discovery on the issue of discriminatory enforcement, stating that if such a defense could be made out, it would be a proper ground for dismissal of the action against them.

The *Murgia* court reviewed a line of authority in federal cases establishing a defense of discriminatory enforcement but observed ". . . the important distinction between 'deliberate invidious discrimination' and 'nonarbitrary selective enforcement' . . . ." *Murgia* concluded that ". . . it is only 'deliberate' (i.e., 'purposeful or intentional') discriminatory enforcement based upon an 'unjustifiable' (i.e., 'invidious') standard which is proscribed by the equal protection clause." (*Murgia* v. *Municipal Court, supra,* at p. 300.)

In *Murgia,* defendants contended that they were singled out for prosecution because of their membership in a labor union. Appellants here do not contend that the *Murgia* doctrine applies to them because of their membership in some class but rather because they were arrested by virtue of their exercise of their First Amendment right. The *Murgia* court noted at page 302: "As the Seventh Circuit recently observed in a similar discriminatory prosecution context: '[J]ust as discrimination on the basis of religion or race is forbidden by the Constitution, so is discrimination on the basis of the exercise of protected First Amendment activities, . . .' [Citations.]"

However, just as appellants' arguments concerning the constitutionality of the statute must fail because the statute does not affect First Amendment rights, appellants' position concerning discriminatory enforcement suffers from the same infirmity. As explained in *Murgia, supra,* at page 297: ". . . [A]n equal protection violation does not arise whenever officials 'prosecute one and not [another] for the same act . . . .'"

Essential to a defense of discriminatory prosecution is the establishment by the defendant that he was engaged in protected activity, which

activity resulted in his arrest. In *United States* v. *Berrios* (2d Cir. 1974) 501 F.2d 1207, 1211, the court explained: "To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie,* (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights. These two essential elements are sometimes referred to as 'intentional and purposeful discrimination.' [Citations.]"

In this case, inasmuch as dissemination of the kind of information referred to in the statute to persons engaged in illegal gambling operations is not protected speech, the selective prosecution of defendants is not based upon an unjustifiable or invidious standard. (See *People* v. *Superior Court (Hartway)* (1977) 19 Cal.3d 338, 348 [138 Cal.Rptr. 66, 562 P.2d 1315]; *People* v. *Garner* (1977) 72 Cal.App.3d 214 [139 Cal.Rptr. 838]; *In re Elizabeth G.* (1975) 53 Cal.App.3d 725 [126 Cal.Rptr. 118].)

*Equal Protection*

■ Appellants argue that the statute in question violates their right to equal protection, in that the news media are expressly exempted therefrom.

In reviewing a legislative classification under the equal protection clause, there are two tests applied by the courts of this state and the United States Supreme Court. In *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 16-17 [112 Cal.Rptr. 786, 520 P.2d 10], the court described and explained the difference between the two tests. The first, commonly referred to as the "rational relationship test," must bear some rational or reasonable relationship to a conceivable legitimate state purpose. A more stringent test, commonly referred to as the "strict scrutiny test," is generally applied in cases concerning suspect classifications or in reviewing legislation which infringes upon fundamental interests. In those cases, ". . . the courts adopt 'an attitude of active and critical analysis, subjecting the classification to strict scrutiny.' " (*D'Amico* v. *Board of Medical Examiners, supra,* at p. 17.)

Having already determined that no fundamental interest is affected by the statute in question, the rational relationship test must be applied to determine whether the exclusion of news media from the prohibitions of the statute bears "some rational relationship to a conceivable legitimate state purpose." (*D'Amico* v. *Board of Medical Examiners, supra,* at p. 16.)

In *Reed* v. *Reed* (1971) 404 U.S. 71 at page 76 [30 L.Ed.2d 225, 229, 92 S.Ct. 229], the United States Supreme Court stated that the classification ". . . must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, . . ." Other jurisdictions have previously considered the reasonableness of a legislative classification such as the one in the case at bar.

In *State* v. *Ucciferri, supra,* 61 So.2d 374, the Florida statute prohibited dissemination of information concerning race results, changing odds, track conditions, etc., ". . . between the period of time beginning one hour prior to the first race of any day and ending thirty minutes after the posting of the official results of each race as to that particular race, . . . (§ 550.35 F.S.A.)" The statute allowed, however, transmission by radio, television, or press wire of information concerning race results. The court found no constitutional infirmity, stating at page 375: "As this court pointed out in the McInerney case, the difference between private wire service and the same service furnished by news periodicals, is one of speed and organization whereby the information secured can be placed in the hands of the purchaser and used for gambling purposes before it is published and becomes public property."

Of particular interest is the opinion of the Justices of the Supreme Court of Massachusetts to the House of Representatives (*Opinion of the Justices* (Mass. 1967) 229 N.E.2d 263). On August 24, 1967, a bill had been proposed prohibiting the dissemination of information concerning horse racing when the information was knowingly used or intended to be used for illegal gambling purposes. The court discussed any potential constitutional problems with the proposed statute and noted at page 267: ". . . subsection (b) requires knowledge and intent. But knowledge of a news medium that its distribution of racing news is used for illegal activities, nevertheless, does not justify improper interference with a free press. The ambiguity inherent in subsection (b) could be clarified by exemptions of news media or by reasonable restriction of the bill's application to them."

It was, therefore, that court's opinion that not only was the exemption of the news media from the statute reasonable, but it was recommended in order to avoid interference with freedom of the press.

The California Legislature may well have concluded that the diverse interests and activities of the news media, which encompassed the dissemination of limitless categories of information, was a valid justification for exempting them from possible inadvertent violation of this statute. Appellants on the other hand are in the business of disseminating information to illegal gamblers which will assist them in their illegal activities.

"All presumptions favor the legislative classification, which cannot be overturned unless plainly arbitrary. [Citations.] If the Legislature could have acted upon any conceivably reasonable ground, the courts must assume that the Legislature acted upon such basis." (*Fraenkel* v. *Bank of America* (1953) 40 Cal.2d 845, 849 [256 P.2d 569].)

Penal Code section 337i does not violate the equal protection clause of the United States or California Constitutions.

### Conclusion

The conviction of appellant Brian Callahan is reversed. All other judgments of conviction herein are affirmed.

Files, P. J., and Kingsley, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 12, 1979.