[No. B007053. Second Dist., Div. Five. June 11, 1986.]

ELIZABETH R. FENDRICH et al., Plaintiffs and Appellants, v.
JOHN K. VAN DE KAMP, as Attorney General, etc.,
Defendant and Respondent.

**COUNSEL**

Musick, Peeler & Garrett, Richard D. Dear and John H. Bauman for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, and Stephen S. Handin, Deputy Attorney General, for Defendant and Respondent.

**OPINION**

**FEINERMAN, P. J.**—This is an appeal from a judgment denying a petition for writ of mandate which challenged the constitutionality of certain regulations propounded by the Attorney General of California under The Gaming Registration Act (Bus. & Prof. Code, § 19800 et seq.). Appellants contend that the Attorney General's regulations deprive them of due process and equal protection, violate their fundamental right to privacy and are arbitrary and excessive.

BACKGROUND

Appellants are the limited partners in The Anthony Company (Company).[1] Company was formed in December 1968, to operate a card club in the City of Gardena called The El Dorado Club (Club). With the exception of those who inherited their partnership interest, the owners of Club have all been associated as limited partners since the establishment's inception.

In 1969, Club was licensed under sections 6-3.01 et seq. of the Gardena Municipal Code (Code). Under relevant provisions of the Code, Club's owners[2] were subject to a complete background investigation by the chief of police (Code, § 6-3.05), after filing a full and complete financial statement (Code, § 6-3.04(a)(15)) and after being fingerprinted and photographed by the police (Code, § 6-3.04(b)).

Upon licensing, Club began renting space to patrons who wished to play cards at its gaming tables for money. Club supervised this gambling activity but did not otherwise participate in running the games. The rent which Club charges is regulated by city ordinance and depends on the maximum bets allowed at particular tables.[3]

Club's operations became subject to state regulation when the Gaming Registration Act (Bus. & Prof. Code, § 19800 et seq.) took effect in July 1984. In enacting this statute, the Legislature indicated its intent to "have concurrent jurisdiction with local governments over gaming establishments within the State of California and to provide uniform, minimum regulation of the operation of those establishments through registration by the Attorney General of those who own or manage gaming clubs."[4]

A review of the legislative history surrounding the act indicates that it was sponsored by the Attorney General, who described some card clubs as a "magnet for criminal elements," with the problems of some clubs being beyond the jurisdiction of individual cities. (Assem. Com. on Governmental Organization, Analysis of Assem. Bill No. 1573 (1983-1984 Reg. Sess.).) While it promoted concurrent regulatory controls, the Attorney General's

[1]The only limited partner in Company who is not a party to this action is George Anthony, who is also Company's sole general partner. Mr. Anthony complied with the regulations being challenged on appeal.

[2]Section 6-3.01(i) of the Code records that "owner" shall mean "every person, firm, association, partnership, corporation, or other entity having any interest, legal or equitable, in any card club or card club license."

[3]Club also derives revenue from its dining and bar facilities.

[4]A "gaming club" means any establishment where legal gambling is conducted and regulated pursuant to local ordinance. (Bus. & Prof. Code, § 19802.)

proposal mandated that local jurisdictions could not authorize individuals to own or operate a gaming club until they first met with State requisites for registration. (Undated memo in Sen. Com. on Governmental Organization files, furnished by the Legislative Intent Service,[5] hereinafter cited as *Memo.*)

In lobbying for the Gaming Registration Act, the Attorney General relied on recent newspaper reports to underscore the need for statewide regulation.[6] Those reports indicated that criminal activity and problems of hidden ownership were common to commercial cardrooms.

The Attorney General's act, as adopted into law, grandfathered in the extant card clubs.[7] However, no parallel consideration was afforded individual owners and managers and no distinction was drawn between active and passive investors. Thus, regardless of when owners or managers acquired an interest in or an attachment to a gaming establishment, and even if licensed previously by local ordinance, state licensing requirements would apply, including the submission of full financial statements. (*Memo.*)[8] ██ The Attorney General was clearly concerned in

---

[5]The Legislative Intent Service is a commercial service which provides documents relating to the origin of California statutes. For an example of its use by the Supreme Court, see *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 219 [185 Cal.Rptr. 270, 649 P.2d 912].

[6]In an undated document in the Senate Committee on Governmental Organization files, furnished by the Legislative Intent Service, entitled "Highlights L.A. Times," and in the *Memo,* the Attorney General emphasized findings in the following four articles:

(1) Reasons and La Riviere, *Bookies, Loan Sharks Fixtures in Poker Clubs,* Los Angeles Times. (Dec. 6, 1982.)

(2) Reasons and La Riviere, *Professional Cheaters Preying at Poker Clubs,* Los Angeles Times. (Dec. 5, 1982.)

(3) La Riviere and Reasons, *Laws to Control Ownership of Poker Clubs Ineffective,* Los Angeles Times. (Dec. 7, 1982.)

(4) La Riviere and Reasons, *Poker: Van de Kamp Urges Regulating Card Clubs,* Los Angeles Times (Dec. 12, 1982.)

[7]Business and Professions Code section 19819 prohibits the introduction of gaming clubs into local jurisdictions which did not permit them prior to January 1, 1984, unless a majority of a jurisdiction's electors subsequently assented to the local licensing of such establishments.

[8]We note, however, that in the bill's final version, the Legislature gave processing priority to those who owned, operated or had a financial interest in gaming clubs on or before January 1, 1983, and to those who sought to renew their state registration. The applications of these individuals were to be acted upon within 60 days after submission of a completed application form. The state was given 180 days to process all other applications. Failure to meet the statutory deadlines in either case meant that the application was deemed granted. (Bus. & Prof. Code, § 19807, subd. (c).) An earlier version of the bill established a 60-day window on the processing of all applications, unless the time period was extended with the agreement of the applicant. (Assem. Amend. to Assem. Bill No. 1573 (1983-1984 Reg. Sess.) May 5, 1983.)

this regard with the piecemeal operation[9] and often inadequate local regulation of California's various card clubs.[10] (*Memo.*)

The Attorney General's advocacy for a Gaming Registration Act resulted in Assembly Bill Number 1573. In the legislative bill file of the Senate Democratic Caucus are letters dated July 7, 1983, to both the Governor and Senator Ralph Dills in which the Attorney General's office indicates that, as amended, the bill's proponents included not only various peacekeeping organizations,[11] but the California Card Club Owners Association, an umbrella group representing all of the state's card clubs.[12]

With passage of the Gaming Registration Act into law, the Legislature directed the Attorney General to adopt rules and regulations for the administration and enforcement of this statute. (Bus. & Prof. Code, § 19803.) The regulations promulgated by the Attorney General require a range of information which falls into three major categories: *Part I* requests general information about the applicant and the gaming club, including the amount of interest in the club and the name and addresses of other owners/investors. *Part II* is a personal history record, which requires information not only on the applicant, but on his parents, children, siblings, spouse, former spouse(s), and in-laws.[13]

---

[9]Such piecemeal treatment stems from the fact that gambling is not unlawful per se in California. Gambling games which are not specifically prohibited are legal under state law, unless otherwise made illegal by local ordinance. (*In re Hubbard* (1964) 62 Cal.2d 119, 124-127 [41 Cal.Rptr. 393, 396 P.2d 809], overruled on other grounds in *Bishop v. City of San Jose* (1969) 1 Cal.3d 56, 63, fn. 6 [81 Cal.Rptr. 465, 460 P.2d 809].) Local entities are left to develop their own licensing and operational restrictions for gambling which is not statutorily precluded. (See Pen. Code, § 330.)

[10]Since localities may derive significant revenues from such establishments, there is obviously little incentive for local jurisdictions to impose stringent licensing and operational requirements upon them.

[11]According to the Attorney General, these groups included the California Peace Officers Association, the California Sheriff's Association, the Los Angeles County Police Chiefs Association and numerous local law enforcement officials.

[12]While the act was not without opposition, it did garner a high degree of legislative support, passing the Assembly Governmental Organization Committee by a vote of 9 to 2 (Assem. Bill No. 1573, approved by Governor, Sept. 9, 1983, Assem. Final Hist. (1983-1984 Reg. Sess.) p. 1002) and the Assembly Committee on Ways and Means by a vote of 17 to 2. (*Ibid.*) The final Assembly floor vote was 62 to 9. On the Senate side, the bill passed without a single dissent in either the Senate Governmental Organization Committee or the Senate Committee on Finance. (*Ibid.*) The final Senate floor vote was 28 to 0. (*Ibid.*)

[13]Information requested about the applicant in *Part II* includes the following: a complete marital history; information on military service; information on arrests, detentions and litigations; a residential and employment history over the past 15 years; character references; information on safe deposit boxes, licenses and involvement with other gambling or gaming ventures. Attachment of a recent color photograph of the applicant is also required. Requested information about the applicant's relatives includes a statement of their birthdates, residences, occupations and felony records.

*Part III* of the application is a financial history record which establishes the degree and character of the applicant's involvement with the gaming establishment, asks how his investment is being financed and determines whether the applicant's interest is being assigned, pledged or sold. This section also asks the applicant whether he has ever filed a bankruptcy petition and advises that state and federal income tax returns might be required during the registration investigation. It further inquires about the applicant's annual salary and other income and asks whether the applicant controls, manages or holds in trust any assets or liabilities for another person or entity. Finally, *Part III* requests a statement of all current assets and liabilities.

In addition to requiring the above information, the Attorney General established a filing fee schedule. The fee is either $250 or $500, depending on the amount invested or the size of the interest owned and whether an applicant has a managerial role. A similar amount is charged for annual renewal fees.[14] First-time applicants are also required to submit two complete sets of fingerprints obtained from a law enforcement agency.

In a letter dated March 1, 1984, the Attorney General and the manager of the gaming registration program sent application packages to all known owners and operators of extant gaming clubs. Rather than comply with the requisite steps for registration, appellants sought a temporary stay order to restrain enforcement of the Attorney General's regulations, claiming them to be improper and unconstitutional. On June 29, 1984, the superior court issued a stay and set the matter for a full hearing on August 20, 1984. At that time, appellants moved for issuance of a peremptory writ of mandate

---

[14]The filing fee for those applicants who had a financial interest in gaming clubs on or before January 1, 1983, is set forth as follows:

"I. INITIAL REGISTRATION FEES:

*$500 Fee*—Individuals who meet any of the following criteria:
A. Have more than a one percent interest;
B. Have more than $5,000 invested; or
C. Serve as a 'manager' of a gaming establishment.

*$250 Fee*—Individuals having a one percent or less interest *and* an investment of $5,000 or less. Only those individuals who meet both criteria (one percent or less interest and no more than a $5,000 investment) can qualify for the $250 fee."

II. ANNUAL RENEWAL FEES:

An annual renewal fee equaling the initial registration fee is charged for renewal applications. An individual who paid a $250 fee for the initial registration starting July 1, 1984, would be assessed $250 for renewal. Likewise, an individual who paid a $500 fee initially would be charged a $500 fee for renewal.

Those acquiring a financial interest in gaming clubs after January 1, 1983, are charged an amount not to exceed the actual, reasonable cost incurred in processing, investigating and approving or denying the initial application and subsequent requests for renewal. (Bus. & Prof. Code, § 19808.)

to compel the Attorney General to rescind the regulations promulgated pursuant to the Gaming Registration Act. The lower court denied appellants' motion and ordered dissolution of the temporary stay order after 10 days. In so doing, the court on its own motion took judicial notice that gambling or gaming has a history of "close associations with organized crime" and that it was therefore necessary and desirable to regulate such activity. The trial court concluded that the regulations propounded by the Attorney General were not an abuse of discretion. On appeal, appellants argue that the superior court erred in denying their petition for writ of mandate.

DISCUSSION

I

Appellants contend that the Attorney General propounded regulations under the Gaming Registration Act which violated their right of privacy and constituted an abuse of administrative and regulatory discretion. ▮ In our analysis of appellants' claims, we are guided by the Supreme Court's discussion of administrative review in *Ford Dealers Assn.* v. *Department of Motor Vehicles* (1982) 32 Cal.3d 347 [185 Cal.Rptr. 453, 650 P.2d 328]. In that case, the court stated that "[w]here the Legislature has delegated to an administrative agency the responsibility to implement a statutory scheme through rules and regulations, the courts will interfere only where the agency has clearly overstepped its statutory authority or violated a constitutional mandate." (*Id.*, at p. 356.) Our task is to examine the "legality of the challenged regulation, not its wisdom," and to determine whether the regulation is "within the scope of the authority conferred" and "reasonably necessary to effectuate the purpose of the statute." (*Id.*, at p. 355.)

▮ In evaluating whether a regulation is "reasonably necessary," a reviewing court will not superimpose its own policy judgment upon an agency, absent an administrative decision which is arbitrary and capricious. The court defers to an agency's expertise and recognizes that there is a strong presumption of correctness and regularity accorded administrative rules and regulations. (*Ford Dealers Assn.* v. *Department of Motor Vehicles, supra,* 32 Cal.3d at p. 355.)

Here, the Attorney General was authorized to adopt rules and regulations for the administration of an act designed to give the state concurrent jurisdiction with local government over gaming establishments and to provide uniform, minimum regulation of the operation of those establishments through registration of those who own or manage gaming clubs. (Bus. & Prof. Code, §§ 19803, 19801.)[15]

---

[15]As of August 2, 1984, there were 329 local jurisdictions in California which permitted gaming clubs.

██ Given the disfavored status of gambling, it is well within the police powers of the state to control its conduct or to prohibit it altogether. (See, e.g., *People* v. *Milano* (1979) 89 Cal.App.3d 153, 163 [152 Cal.Rptr. 318]; *People* v. *Sullivan* (1943) 60 Cal.App.2d 539, 542-544 [141 P.2d 230].) However, once having authorized a form of such business activity, the state may not propound regulations which are arbitrary and excessively intrude upon an individual's right to privacy. ██ Upon review of the registration disclosures required of appellants under the Gaming Registration Act, we find that certain portions of the Attorney General's request for information were overly broad and intrusive.

First, we do not believe that certain portions of the required information relating to a limited partner's family members and former spouse(s) are reasonably necessary to insure the uniform and crime-free regulation of gaming establishments. In the personal history portion of the application, applicants are asked to list not only names, residences, addresses, dates of birth and most recent occupations for their spouses and children, but also for their parents, parents-in-law, or legal guardian, and for their brothers and sisters and their respective spouses. Under the marital information portion of this section, applicants must divulge a full history of failed marital relationships, indicating when and where one filed for legal separation, divorce or annulment. An applicant is not only required to list the full name and birthdates of previous spouses, but to report the specific current addresses and phone numbers of these individuals.[16]

While this collection and retention of information may appear to be innocuous on its face, it is being gathered by the Department of Justice without the consent of the persons listed and without any readily justifiable regulatory purpose. "The proliferation of government and business records over which we have no control limits our ability to control our personal lives," especially for those unaware that these records even exist and unable to determine who has access to them. (*White* v. *Davis* (1975) 13 Cal.3d 757, 774-775 [120 Cal.Rptr. 94, 533 P.2d 222], quoting from statements in the state's 1972 election brochure by proponents of a constitutional right of privacy.) While it may be appropriate for the Attorney General to request personal information on one's nuclear family, we find it inappropriate with respect to one's in-laws and other family or former family members.

We also find overly intrusive certain questions posed in both the personal and financial history portions of the application which require an applicant to list all safety deposit boxes or other such depositories and the amount of

---

[16]Needless to say, asking applicants to keep apprised of their former spouses' whereabouts may be quite difficult.

cash therein and whether one has access to or uses another person's depository. If the answer is "yes," the box number and location must be set forth. As a result, these "other persons" would have their box numbers and locations recorded by the state without prior notice or an opportunity to object.[17]

■ Finally, one of the information release forms required by the Gaming Registration Act clearly violates the California Right to Financial Privacy Act. (Gov. Code, § 7460 et seq.)[18] It does so in two respects: First, under the Financial Privacy Act, a statement authorizing disclosure must include written notification that the customer has the right to revoke the authorization at any time, except where such authorization is required by statute—an exception which is not applicable under the Gaming Registration Act. (Gov. Code, § 7473, subd. (c).) The Attorney General's application form contains no such statement. Second, a statement of authorization must include the period for which the disclosure is authorized, the statutory purpose for such disclosure and a specific identification of the financial records to be disclosed. (Gov. Code, § 7473, subd. (a)(1), (2), (3).) The registration act's form does not specify the period for which disclosure is authorized or the specific documents to be disclosed. While each would-be registrant bears the burden of proving that his application merits approval, this should not, absent probable cause, require unrestricted access by the Justice Department to "any and all documents, records or correspondence" pertaining to him which a financial institution may hold.

■ In all other respects, we find the Attorney General's request for personal and financial information proper. Despite appellants' claim that

---

[17]We also note that in the financial history portion of the application is the advisement that state and federal income tax returns might be required during the registration investigation. Such a release requirement is of questionable legality with respect to federal returns. This problem of disclosure has been rendered, at least temporarily, moot by a letter to applicants from the Justice Department, dated June 15, 1984, which stated that an authorization for the release of tax forms need not be included in the initial application for registration. Nevertheless, applicants were reminded that if access to tax information became necessary during the course of an investigation relating to the Gaming Registration Act, they would then have to sign tax release forms.

[18]The applicant's request to release information form reads in relevant part as follows:

"1. I hereby authorize and request all persons to whom this request is presented, having information relating to or concerning me, to furnish such information to a duly appointed representative of the California Department of Justice.

" . . . . . . . . . . . . . . . . . . . .

"3. If the person to whom this request is presented is a brokerage firm, bank, savings and loan, or other financial institution or any officer of same, I hereby authorize and request that a duly appointed representative of the California Department of Justice be permitted to review and obtain copies of any and all documents, records or correspondence pertaining to me.

"4. I have filed with the California Department of Justice an 'application' as that term is defined in Section 19807(a) of the Business and Professions Code. I understand that I am seeking the granting of a privilege and acknowledge that the burden of proving my qualifications for a favorable determination is at all times on me."

they are merely passive investors without control over the gaming aspects of the card establishment, their sponsorship is integral to the existence of Club's facilities and gambling-related activities.[19]

■ Having chosen to invest in a gaming establishment, appellants must submit to the police powers of the state to protect the public welfare. The reasonableness of regulation under such powers is dependent on the "nature of the business being regulated and the degree of threat that the operation of such business presents to the tranquility, good order, and well-being of the community at large. So long as a 'patent relationship between the regulations and the protection of the public health, safety, morals, or general welfare' exists, the regulations will be considered reasonable. [Citations.]" (*7978 Corporation* v. *Pitchess* (1974) 41 Cal.App.3d 42, 47 [115 Cal.Rptr. 746].)

■ The state has a substantial interest in assuring, to the extent possible, that gaming activities are conducted in a corruption-free environment. Here, that interest is balanced against the right of privacy claimed by those who wish to invest in and profit from such activities. We find that the constitutional right of privacy is not absolute when weighed against the need for legitimate business regulation under "the government's right and duty to exercise its police powers for the public good." (*Gregory* v. *City of San Juan Capistrano* (1983) 142 Cal.App.3d 72, 87 [191 Cal.Rptr. 47].)

■ We also note that nothing in the legislative history of the Gaming Registration Act suggests that those owners or managers licensed locally for many years should be exempt from fully complying with reasonable requirements for state registration. Although the gaming clubs themselves are automatically "grandfathered" in as viable entities, it would be completely destructive of the legislative purpose to treat the owners or managers of the clubs in a similar fashion.

The purpose of the legislation is to allow the state to act prophylactically in protecting the public interest. Given the fact that many cities permitting gaming clubs derive a substantial portion of their revenue from licensing fees, there is a possible conflict of interest in this area for local regulators.

To exclude those previously licensed by municipalities from careful and disinterested state scrutiny would put the state in the untenable position of reacting to rather than being able to prevent potential problems. The express

---

[19]Moreover, limited partners do have a significant, if indirect, say over the operations and management of Club by virtue of their right to elect or remove the general partner and their right to vote on matters affecting the basic structure of the partnership, including the sale of all or substantially all of the assets of the partnership. (Corp. Code, § 15507, subd. (b).)

intent of the Gaming Registration Act is to institute uniform regulations through state registration. This purpose would be eviscerated if local licensure were permitted to shield individuals from the legislatively delegated investigative and regulatory powers of the Attorney General.

 Accordingly, we conclude that development of a personal profile on investors in gaming establishments, with the exception of those objectionable areas noted above, is well within the powers of the state to protect the public's interest. Similarly, the state is entitled to a financial history of the appellants. Even under the local ordinance by which appellants have been licensed and abided since 1969, anyone with an ownership interest in a card gaming establishment is required to file a "full and complete financial statement." (Code, § 6-3.04(a)(15).) The state's right to collect similar information certainly is not preempted by a municipality's previous request for such data.

## II

 The statutory scheme established by the Gaming Registration Act prohibits anyone from owning or operating a gaming club without first securing a valid registration from the Attorney General. (Bus. & Prof. Code, § 19805, subd. (a).) Appellants contend that the act and the regulations issued thereunder are violative of due process because they can divest Company of its property interest in Club, without benefit of a prior hearing, if any one of the limited partners should be denied registration or have it revoked. They argue that Club would have to summarily cease operations until the disapproved partner was removed, despite the fact Club has operated in compliance with municipal licensing ordinances since 1969.

 Contrary to appellants' contention, the Gaming Registration Act affords full administrative and judicial review of an applicant's rejection for registration. Business and Professions Code section 19813 provides that, "[a]ll hearings relating to the denial, suspension, or violation of a registration shall be conducted in accordance with the provisions of Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code.[20] These proceedings shall be subject to judicial review pursuant to section 1094.5 of the Code of Civil Procedure."

 Moreover, nothing in the record suggests that appellants have been divested of their gaming interest or were threatened with prehearing

---

[20]These provisions provide an administrative forum for purposes of adjudicating whether a right, authority, license or privilege should be revoked, suspended, limited or conditioned. (Gov. Code, § 11503.) Subsumed by this procedural framework is the regulation of other gambling activities, such as the suspension or revocation of a license issued by the Horse Racing Board.

divestiture prior to exhaustion of the remedies authorized by section 19813—despite their failure to make timely application for registration. Appellants have not shown that the statute is "being invoked against [them] in the aspects or under the circumstances which [they suggest], and hence may not be heard to complain." (*In re Cregler* (1961) 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305].)

### III

Appellants also contend that the classification delineated in and delimited by the Gaming Registration Act violates equal protection. The basis of this argument is twofold: First, appellants maintain that since horse racing, bingo and gaming clubs are all similarly situated, highly regulated gambling activities capable of breeding the type of evils which the Legislature seeks to control, no rational basis exists for subjecting only the financial backers of gaming clubs to an intrusive application process. Second, appellants insist that arbitrary distinctions are drawn both between individuals who have interests of less than 1 percent or $5,000 in a gaming club and those who have more and between those who affiliated with a gaming club prior to January 1, 1983, and those who later associated with such clubs. As discussed below, we find no merit in either argument.

### A. *Horse Racing, Bingo and Gaming Clubs*

Appellants assert that in singling out card clubs for over-regulation, the Legislature effectively manacled a discrete minority incapable of political retribution. This, they claim, has happened because card clubs and their investors and supporters are too few in number to have political clout in California. By contrast, appellants attribute the less onerous treatment of passive investors or shareholders in the horse racing industry to the strength of that industry's legislative lobby and the size of its revenue contributions to the state's coffers.[21] Even assuming, arguendo, a difference in the political power of various gambling-related interests, we find no unconstitutional discrimination.

Equal protection of the law guarantees that persons similarly situated with respect to the legitimate purpose of the law will enjoy similar treatment. This concept, however, does not require absolute equality; rather, it permits a state to provide for differences so long as they do not result in invidious discrimination. (*Overturf* v. *California Horse Racing Bd.* (1978) 86

---

[21]Appellants liken the status of limited partners in gaming clubs to that of shareholders in race tracks, because neither have a role in the daily operations of their respective gaming or gambling establishments.

Cal.App.3d 979, 984-985 [150 Cal.Rptr. 657]; *O. G. Sansone Co.* v. *Department of Transportation* (1976) 55 Cal.App.3d 434, 457 [127 Cal.Rptr. 799].) ■ Thus, "[s]tate legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." (*McGowan* v. *Maryland* (1961) 366 U.S. 420, 425-426 [6 L.Ed.2d 393, 399, 81 S.Ct. 1101], cited in *Steed* v. *Imperial Airlines* (1974) 12 Cal.3d 115, 124 [115 Cal.Rptr. 329, 524 P.2d 801, 68 A.L.R.3d 1204].) ■ Moreover, it is not the court's function to weigh the social value of a statute to determine whether a classification may have been more finely drawn. (*Steed* v. *Imperial Airlines, supra,* 12 Cal.3d at p. 124.)

■ The Legislature's diverse regulatory approach to different forms of gambling activity is not unreasonable. Horse racing has been subject to comprehensive, uniform state regulation since 1933 (Cal. Const., art. IV, § 19, subd. (b), formerly art. IV, § 25a), with the creation of a Horse Racing Board given "'full power to prescribe rules, regulations and conditions' governing the conduct of horse races where there is wagering." (*Sandstrom* v. *Cal. Horse Racing Board* (1948) 31 Cal.2d 401, 413 [189 P.2d 17, 3 A.L.R.2d 90].) While the shareholders in the horse racing industry may currently be required to disclose less information about themselves than are the limited partners in card clubs,[22] nothing in the state's Horse Racing Law (Bus. & Prof. Code, § 19400 et seq.) precludes a request for such information. ■ Equal protection does not require the Legislature to treat two evils identically or to legislate as to all phases of a field at once. (*O. G. Sansone Co.* v. *Department of Transportation, supra,* 55 Cal.App.3d at p. 457.)

■ Additionally, even a quick comparison of the state's Horse Racing Law with that of the Gaming Registration Act reveals a much more highly structured and detailed concern with the daily operations of horse racing than the operations of gaming establishments. In its concern to protect the public in areas of commercialized gambling, we cannot say that such differences in regulatory emphasis are irrational.

■ With respect to bingo games, this activity differs significantly from both card gaming and horse racing. By constitutional dictate (Cal. Const., art. IV, § 19, subd. (c)), it can only be run for charitable purposes.[23] The

---

[22]Given the record on appeal, it is unclear what, if any, application those who own stock in a race track must now submit to the state.

[23]By contrast, although charity days are provided for in the Horse Racing Law (Bus. & Prof. Code, § 19550), no license to conduct a horse race meeting can be issued to a nonprofit corporation with tax exempt status, or to those who propose to conduct a horse race meeting for the benefit of any such nonprofit corporation (Bus. & Prof. Code, § 19482).

profits derived from bingo cannot be commingled with other than a charity-bound fund or account (Pen. Code, § 326.5, subd. (j)) and none but the organization authorized to conduct the game can hold a financial interest in it. (Pen. Code, § 326.5, subd. (i).) Likewise, those who operate a bingo game may not derive financial gain from their participation. (Pen. Code, § 326.5, subd. (h).)[24]

 Since no personal business profit obtains from the operation or promotion of commercial bingo, there is less likelihood that proceeds will be diverted to unlawful ends. Thus, we find no invidious discrimination in the Legislature's differing treatment of profit making gaming clubs and nonprofit making bingo games.[25]

## B. *Filing Fee Differences*

 Section 19808 of the Gaming Registration Act mandates that the application and renewal fees for individuals who owned, operated, or had a financial interest in gaming clubs on or before January 1, 1983, shall not exceed $500. All other applicants are to be charged an amount "not to exceed the actual, reasonable cost incurred in processing, investigating and approving or denying the application."

The Attorney General further refined this provision with respect to those who acquired their interest by January 1, 1983: The relevant regulation reads that the maximum $500 fee prescribed by the act is only to be charged those who have a management role or who have invested more than $5,000 or who own more than a 1 percent interest in a gaming establishment. Individuals with a lesser financial interest and who serve no managerial role are assessed a $250 filing fee.

Appellants complain that any threat an investor poses to the public is the same regardless of his or her interest and that the cost of processing applications should therefore be uniform. Appellants' argument has no merit.

 In his declaration in support of appellants' petition for a peremptory writ of mandate, Company's general partner, George Anthony, stated he was "President of the California Card Club Owners' Association." In this capacity, he met on numerous occasions with the Attorney General and his

---

[24]This subdivision does not preclude the employment of security personnel who are not members of the game's sponsoring organization.

[25]That the state views bingo as distinct from card gaming is clear from the Gaming Registration Act itself. Section 19825 of the Business and Professions Code specifically states that "[t]his chapter shall not be applicable to any bingo game which is conducted in a city, county, or city and county pursuant to Section 326.5 of the Penal Code."

staff to discuss the Gaming Registration Act. Anthony states that through the negotiations which ensued, he "was successful in bringing about a reduction in the filing fee for partners investing less than $5,000 or owning less than one percent . . . ." Company cannot now be heard to complain that its own negotiated reduction of filing fees for smaller investors violates its limited partners' rights to equal protection.

Further, the declaration of the program manager for the gaming registration program, James M. Watson (Watson), indicates that a split-level fee structure was developed to insure that "people who held a very small interest in the gaming industry and had invested a small amount of money would not be unfairly penalized by the new statute." This equitable concern for fairness was a reasonable basis for the Attorney General to authorize regulatory distinctions between the filing fee requirements for different investors.

Finally, appellants maintain that no rational grounds exist for distinguishing between those who affiliated with gaming establishments before and after January 1, 1983. They also suggest that the rule governing newer investors invites an abuse of discretion because the more intrusive the application form, the easier to justify ever greater charges as being "actual" and "reasonable." (Bus. & Prof. Code, § 19808.)

Watson's declaration clarifies why the statute's $500 stated maximum was displaced by the actual and reasonable cost standard. In projecting time and cost estimates for field investigations under the gaming registration program, Watson's staff determined that a similar background investigation program was already being conducted on applicants for the position of Narcotic Agent Trainee. In fiscal year 1982/1983, the Bureau of Investigation conducted 65 background checks on these trainee applicants. It took an average of 95 hours for each investigation. At a billing rate of $52 per hour, the "grand-father clause that placed a $500 maximum on the amount of fees that [the Gaming Registration Program] could charge for registration would result in all funds being expended on the field investigation effort."

Watson stated that such investigative expenditures would therefore leave insufficient funds for staffing the "administration, clerical, and analytical functions of an ongoing registration program involving some 1,200 individuals and 600 separate clubs." It was then decided to drastically cut the allotted field investigation time and we may infer that the Legislature reasonably wished to effect a more reasonable and realistic approach to filing fee assessments in instituting the January 1, 1983, cutoff date.

With respect to appellants' claim that a charge of "actual" and "reasonable" cost could become potentially abusive, the rule is well settled

that "one will not be heard to attack a statute on grounds that are not shown to be applicable to himself . . . . [A] court will not consider every conceivable situation which might arise under the language of [a] statute and will not consider the question of constitutionality with reference to hypothetical situations." (*In re Cregler* (1961) 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305].) Here, appellants all acquired their ownership interest prior to January 1, 1983, and have no basis upon which to challenge the disputed provision.

## IV

 Appellants concede that licensing fees do not have to be confined to the exact cost of license issuance and may include any reasonably probable cost, direct or incidental, which is related to the administration of the licensing provisions. They protest, however, that the fee charged for licensure under the Gaming Registration Act, when coupled with the fees collected by municipalities with whom the Attorney General will regulate concurrently, combine to unduly burden those who presently own interests in gaming establishments. In particular, appellants contend that the state-required fees are exorbitant because the Attorney General's disclosure requirements are unnecessarily intrusive and broad-ranging. This, they say, feeds the high cost of investigation and administration. Upon review, we agree, in part, that the state's charges seem excessive, but only with respect to the annual renewal fees.

We note at the outset that " " " "where [a] fee is imposed for the purpose of regulation, and the statute requires compliance with certain conditions in addition to the payment of the prescribed sum, such sum is a license proper, imposed by virtue of the police power . . . ." " " " (*United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 165 [154 Cal.Rptr. 263].) The general rule is that "a regulatory license or permit fee levied cannot exceed the sum reasonably necessary to cover the costs of the regulatory purpose sought." (*Ibid.*)

Here, the Gaming Registration Act specifies that all fees, revenues and penalties collected are to be used to offset the costs attendant to executing the statute. (Bus. & Prof. Code, § 19818.) An examination of program manager Watson's declaration reveals that the first-time registration fees of $250 and $500 were not inordinate. Watson summarized the situation as follows: Given that the "cost of conducting field investigations is significantly under-budgeted, that legal support services are not budgeted for the first year of the program, and reduced revenues because of the effort to cause small investors less of a financial hardship than large investors, it is

estimated that actual first-year program costs will exceed budgeted funds by approximately twenty percent.''

Even eliminating those requested disclosures which we view as abridging appellants' right of privacy, the initial investigation and analysis left to be conducted is still costly. The gaming registration budget must not only provide the funds needed to process the applications, conduct audits and other aspects of the field investigations, but it must also finance the ''administrative, investigative, and legal support'' necessary ''in the event of appeals or court cases involving applicants who are denied registration.''

While we are mindful of the reasonableness of the filing fees required of first-time applicants, the record discloses no logical basis for charging an annual renewal fee which is identical to the original assessment. Common sense would dictate that as the work associated with regulatory responsibilities eased, so would the schedule of fees. Since an applicant's file is presumably cumulative, far fewer resources would seem to be needed to conduct current, annual background checks than were first required to review the applicant's personal and financial history over a substantial period of time.

We find that the administrative fees levied for annual renewals of an applicant's registration exceeded the sum reasonably necessary to cover the costs of the Gaming Registration Act's regulatory purpose, (*United Business Com.* v. *City of San Diego, supra,* 91 Cal.App.3d at p. 165).[26] It is therefore incumbent upon the Attorney General to develop a more elastic approach to determining appropriate assessments. Fees should be commensurate with the reasonable cost of regulation.

In determining what is reasonable, we are also concerned with the fairness of such fees and the fact that they not be so onerous as to deprive individual appellants of a return on their investment. As discussed above, this concern is echoed in the Attorney General's two-tiered approach to filing fee charges, but we are not satisfied that this suffices for purposes of renewal.[27]

---

[26]We note that the gaming registration program is not wholly dependent on the monies collected from applicants for registration and reregistration to fund and enforce the Gaming Registration Act. Business and Professions Code section 19815 provides that ''[w]hen the Attorney General determines it necessary to protect the public interest, he or she may bring an action against a registrant pursuant to [Bus. & Prof. Code] Section 125.8'' (temporary order restraining licensee engaged or about to engage in violation of law). ''In addition to the remedy prescribed in those sections, the Attorney General may recover investigative costs and attorney fees.''

[27]We are satisfied, however, that the extraordinary ''start-up'' costs involved with evaluating first-time applications justify a one-time assessment of fees following the two-tiered approach now taken by the Attorney General.

The current fee schedule distinguishes between those who have more and those who have less than a $5,000 investment. Yet, this split-level approach invites unfairness. For example, a limited partner with an investment of $5,001 would be charged $500 for the privilege of reregistration. This constitutes nearly 10 percent of the investor's money which would be taken from him year after year. If the investor realized less than a 10 percent return on his money, he could realize no profit at all from his partnership interest. In balancing what is fair with what is reasonable, the Attorney General should not only look at the actual cost of regulation but at the size of each partner's share, to effect a more refined and equitable means of assessing fees.

We remand this matter to the trial court for modification of its order in light of the opinions expressed herein. In all other respects, the trial court's denial of appellant's petition for writ of mandate is affirmed.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied July 8, 1986.