[No. B028786. Second Dist., Div. Three. Oct. 6, 1988.]

ELIZABETH R. FENDRICH et al., Plaintiffs and Appellants, v. JOHN K. VAN DE KAMP, as Attorney General, etc., Defendant and Respondent.

COUNSEL

Musick, Peeler & Garrett, Richard D. Dear, James W. Miller and John Logan Hunter, for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, and Stephen S. Handin, Deputy Attorney General, for Defendant and Respondent.

OPINION

CROSKEY, J.—On June 11, 1986, *Fendrich* v. *Van de Kamp* (1986) 182 Cal.App.3d 246 [227 Cal.Rptr. 262], affirmed the denial of appellants' ("Fendrich") petition for writ of mandate challenging the constitutionality of certain regulations propounded by the Attorney General of California under The Gaming Registration Act (Bus. & Prof. Code, § 19800 et seq.). However, the matter was remanded to the trial court so that the Attorney General could revise the Gaming Registration renewal fee schedule "to effect a more refined and equitable means of assessing fees." Pursuant to the remand, a peremptory writ of mandate issued in February 1987. On March

24, 1987, the Attorney General filed a return to the writ proposing a four-tier renewal application fee schedule. On May 19, 1987, the trial court upheld the Attorney General's proposed renewal fee schedule, and this appeal followed.

## ISSUES

Appellants contend (1) that the trial court erred in ruling that the return submitted by the Attorney General complies with the terms of the peremptory writ of mandate, the opinion set forth in *Fendrich* v. *Van de Kamp* and Business and Professions Code section 19808, subdivision (b) and (2) that the court erred in refusing to rule on appellants' entitlement to a refund of renewal fees expended in prior years to the extent they exceed the actual "reasonable renewal fee" of "$60.00".

## BACKGROUND

Appellants are the limited partners in The Anthony Company (Company)[1] dba "The El Dorado Club" (Club) a card club in the City of Gardena, which has been subject to the provisions of The Gaming Registration Act (Act) since the Act became operative on July 1, 1984. The regulations promulgated by the Attorney General under the Act require all persons owning an interest in a gaming establishment to pay an initial application fee and an annual renewal fee.

Section 19808 of the Act provides that "(a) The fee for applications for registration by individuals who owned, operated, or had a financial interest in gaming clubs on or before January 1, 1983, or for applications to renew registrations granted pursuant to this chapter, shall not exceed five hundred dollars ($500). All other applicants shall be charged an amount not to exceed the actual, reasonable cost incurred in processing, investigating, and approving or denying the application. [¶] (b) An annual renewal fee shall be assessed which shall not exceed the actual, reasonable cost incurred in processing, investigating, and approving or denying the renewal application."

Before the decision in *Fendrich, supra,* 182 Cal.App.3d 246, the Attorney General established that the maximum $500 fee is only to be charged those who have a management role or who have invested more than $5,000 or

---

[1] The only limited partner in Company who is not a party to this action is George Anthony, who is also Company's sole general partner.

who own more than a 1 percent interest in a gaming establishment. Individuals with a lesser financial interest and who serve no managerial role are assessed a $250 filing fee.[2]

The court in *Fendrich* disapproved the Attorney General's two-tiered approach as "excessive," stating that "the record discloses no logical basis for charging an annual renewal fee which is identical to the original assessment. Common sense would dictate that as that work associated with regulatory responsibilities eased, so would the schedule of fees." (*Fendrich* v. *Van de Kamp, supra,* 182 Cal.App.3d 246, 267.) The court further found "that the administrative fees levied for annual renewals of an applicant's registration exceeded the sum reasonably necessary to cover the costs of the Gaming Registration Act's regulatory purpose, [citation].[3] It is therefore incumbent upon the Attorney General to develop a more elastic approach to determining appropriate assessments. Fees should be commensurate with the reasonable cost of regulation. [¶] In determining what is reasonable, we are also concerned with the fairness of such fees and the fact that they not be so onerous as to deprive individual appellants of a return on their investment. . . . [¶] The current fee schedule distinguishes between those who have more and those who have less than a $5,000 investment. Yet, this split-level approach invites unfairness. . . . In balancing what is fair with what

---

[2] "The filing fee for those applicants who had a financial interest in gaming clubs on or before January 1, 1983, is set forth as follows:

" 'I. Initial Registration Fees:

*$500 Fee* —Individuals who meet any of the following criteria:

A.  Have more than a one percent interest;

B.  Have more than $5,000 invested; or

C.  Serve as a "manager" of a gaming establishment.

*$250 Fee* —Individuals having a one percent or less interest *and* an investment of $5,000 or less. Only those individuals who meet both criteria (one percent or less interest and no more than a $5,000 investment) can qualify for the $250 fee.'

"II. Annual Renewal Fees:

An annual renewal fee equaling the initial registration fee is charged for renewal applications. An individual who paid a $250 fee for the initial registration starting July 1, 1984, would be assessed $250 for renewal. Likewise, an individual who paid a $500 fee initially would be charged a $500 fee for renewal.

Those acquiring a financial interest in gaming clubs after January 1, 1983, are charged an amount not to exceed the actual, reasonable cost incurred in processing, investigating and approving or denying the initial application and subsequent requests for renewal. (Bus. & Prof. Code, § 19808.)" (*Fendrich* v. *Van de Kamp, supra,* 182 Cal.App.3d at p. 256, fn. 14.)

[3] We note that the gaming registration program is not wholly dependent on the monies collected from applicants for registration and reregistration to fund and enforce The Gaming Registration Act. Business and Professions Code section 19815 provides that "When the Attorney General determines it necessary to protect the public interest, he or she may bring an action against a registrant pursuant to [Bus. & Prof. Code] Section 125.8 [temporary order restraining licensee engaged or about to engage in violation of law]. In addition to the remedy prescribed in those sections [*sic*], the Attorney General may recover investigative costs and attorney fees."

is reasonable, the Attorney General should not only look at the actual cost of regulation but at the size of each partner's share, to effect a more refined and equitable means of assessing fees." (*Id.,* at pp. 267-268, fn. omitted.)

In response to *Fendrich,* the Attorney General proposed the following new renewal fee schedule in its return to the writ of mandate:

| INVESTMENT RANGE | ANNUAL RENEWAL FEE |
|---|---|
| $     0  -   5,000 | $200 |
| 5,001  -  25,000 | 300 |
| 25,001  -  75,000 | 400 |
| 75,001  - and up | 500 |
| Manager/Non-Revocable Trustee | 300 |

Attached to the return was the declaration of James Watson, Gaming Registration Program Manager, stating that to comply with the court's order, the department established a base cost that applies to all renewal registration; that it determined that the actual cost for processing renewal registrations and maintenance of registration files is $313 per year, rounded off to $300; and that the proposed four-tiered fee schedule "presumes that all registrants should pay some reasonable share of the direct cost of renewal registration, i.e., the lowest fee is $200 or two-thirds of the actual cost"; to compensate for the deficit, those with larger investments pay an increased fee commensurate with the size of the investment; managers and non-revocable trustees pay the actual direct cost.

Before reaching a determination, the trial court also authorized the deposing of Mr. Watson. In his deposition Mr. Watson testified as to how the Gaming Registration Program administers the registration renewal process and to the attendant costs involved. The trial court, in finding that the proposed schedule was "a reasonable and equitable one," stated that it was "impressed with the apparent candor of Mr. Watson and with the depth of study that has gone into the development of the renewal fee schedule."

### DISCUSSION

Appellants contend that the trial court erred in approving the four-tiered renewal fee schedule. They argue that the fees are "excessive" because the Attorney General, in determining the assessments, considered the

cost of virtually all activities and related costs of the entire program.[4] They assert that Business and Professions Code section 19808, subdivision (b) limits the assessment to only that amount which represents "the actual cost to the Program in terms of manhours and resources expended in processing a renewal application"; and that if the cost of activities not specified in the statute were eliminated, the actual cost of processing renewals would be only $60 rather than $300 since it takes only three manhours to actually process each renewal.

■   When an appellate court opinion directs the trial court to modify its decision in accordance with the opinion, it vests the trial court with the sound discretion to interpret and implement the opinion. (*Estate of Dargie* (1941) 48 Cal.App.2d 101, 105 [119 P.2d 438].) Absent an abuse of that discretion, the reviewing court may not substitute its own opinion for that of the trial court.

■   Business and Professions Code section 19808, subdivision (b) states: "An annual renewal fee shall be assessed which shall not exceed the actual, reasonable cost incurred in processing, investigating, and approving or denying the renewal application." Appellants argue that the statute must be read in conjunction with the language of *Fendrich*; consequently, renewal fees are appropriate in amount so long as they do not exceed "the sum reasonably necessary to cover the costs of the Gaming Registration Act's regulatory purpose" and are in an amount "commensurate with the reasonable cost of regulation." (*Fendrich, supra,* 182 Cal.App.3d at p. 267.)

However, the court in *Fendrich* also noted that appellants had conceded "that licensing fees do not have to be confined to the exact cost of license issuance and may include any reasonably probable cost, direct or incidental, which is related to the administration of the licensing provisions." (182 Cal.App.3d at p. 266.)

Thus, it is clear that renewal fees may be set in an amount sufficient to defray all costs necessary to process and investigate the renewal application. It is apparent that there is more to renewing the applications than the estimated three hours to actually process the paperwork since the processing of renewal applications cannot take place in a vacuum. According to Mr. Watson, the department must maintain a file and collect information throughout the year in order intelligently to decide whether or not to

---

[4] The program budget considered by the Attorney General included non-regulatory activities, i.e., the providing of technical repairs and assistance, legislative activities, for example, meetings and special projects, general ongoing enforcement activities such as closing applications, handling revocations and appeals, and administrative overhead expenses such as training personnel, maintaining files and preparing the annual budget.

approve the renewal. Ninety to ninety-five percent of program time is spent on renewal registrants and activities related to the maintenance of registrants' files. Only five to ten percent of time is actually spent on new applications.

Contrary to appellant's argument, the Attorney General has not construed the renewal process as encompassing virtually *all* activities and related costs of the *entire* Gaming Registration Program, except for those activities which specifically relate to the processing of the initial application for registration. According to Mr. Watson the budget projection included the closing of files,[5] the maintaining of the registrant's file,[6] the preparation and maintenance of the projected budget for the program,[7] the preparation of "Technical reports/Assistance,"[8] administrative support, meetings, special projects, legislative activities and training.[9] After reaching the total amount for the above expenses, the cost of new application processing ($11,238)[10] was subtracted from the total budget ($293,000) and the difference was divided by the average number of renewal applicants (900). This amount was then rounded off to $300 and became the figure used for the average renewal cost ($300) per registrant. From this basis the four-tiered schedule was constructed so that the fee would be commensurate to the size of the individual's investment as per *Fendrich*.

Appellants argue that the renewal fees generated by this program should not be the sole source of funding for the program; that the program should not be supported "exclusively by a discrete group of captive 'clients' of the Program." According to Business and Professions Code section 19818, "All fees, revenues, and penalties collected pursuant to this chapter shall be deposited in a special account in the General Fund to be available for expenditure by the Department of Justice to offset costs incurred pursuant to this chapter when appropriated by the Legislature therefor." Contrary to

---

[5] Most of the files closed are those of existing registrants which decide not to renew.

[6] It is this file, which includes all the information which has been accumulated during the year, that is the basis for evaluating the renewal applications. Maintenance of the file includes responding to public, media and law enforcement inquiries concerning the registrant, preparing quarterly reports and investigating registrants.

[7] This is clearly an acceptable part of administrative overhead without which the program could not be successfully run.

[8] This relates almost totally to active registrants, and involves the exchange of information with local agencies regarding active registrants holding an interest or managing clubs in a separate jurisdiction.

[9] Again, this is part of the overhead expense naturally inherent in maintaining and analyzing the files which is the basis for evaluating the renewal applications.

[10] This figure represents only *the cost of administrative overhead attributable to new applications.* Applicants for new registration are charged directly for additional costs (i.e., field investigative time) and their costs are paid outside of the budget. (Bus. & Prof. Code, § 19808, subd. (a).)

appellant's argument, the Legislature intended for the program to support itself through registration fees from the new and renewal applicants. Other sources of revenue such as civil penalties and fines are minimal. Suspension and revocation proceedings do not result in any income. The program was not meant to operate at a loss and at the expense of the general taxpayers.

The four-tiered fee schedule proposed by Attorney General is reasonable considering the nature and problems of program budgeting. It considers not only the actual cost of regulation but the size of each applicant's investment and does not appear to be so onerous as to deprive the applicants of a return on their investment. The trial court did not abuse its discretion in approving the fee schedule.

Appellants also raise the issue of whether they are entitled to a refund of renewal fee overpayments. The Attorney General concedes that appellants are entitled to refunds upon fulfilling all jurisdictional and procedural requisites to perfecting a claim for refunds.

The trial court's order of May 19, 1987, overruling appellants' objections to the Attorney General's return is affirmed.

Danielson, Acting P. J., and Arabian, J., concurred.