[No. C009970. Third Dist. Apr. 28, 1992.]

COUNTY OF YOLO et al., Plaintiffs, Cross-defendants and Appellants, v. LOS RIOS COMMUNITY COLLEGE DISTRICT et al., Defendants, Cross-complainants and Respondents.

COUNSEL

Downey, Brand, Seymour & Rohwer and Patrick J. Borchers for Plaintiffs, Cross-defendants and Appellants.

Littler, Mendelson, Fastiff & Tichy, Sandra L. Disario, Michelle R. Witt and Ophelia H. Zeff for Defendants, Cross-complainants and Respondents.

Kronick, Moskovitz, Tiedemann & Girard and Robert A. Rundstrom as Amici Curiae on behalf of Defendants, Cross-complainants and Respondents.

## OPINION

DAVIS, J.—"Time is a dressmaker specializing in alterations." (Baldwin, Face Towards the Spring (Reinehart 1956).) After years of billing school districts for certain election costs, the County Clerk of Yolo County has begun to charge these same school districts for types of expenses heretofore paid by Yolo County (County). Predictably, the school districts object. In this appeal we examine the kinds of election costs that a county can charge a school district. We conclude that a county cannot charge a school district for the costs of election functions, activities or operations the county would have to undertake or engage in regardless of whether the school district was in the election. In other words, a county can charge a school district for only those election costs the county incurs because the school district is participating in a particular election. We also conclude that a county cannot charge a school district for costs incurred in board races where there is only one candidate for each office and the candidate takes office under Education Code sections 5326 and 5328. We affirm the judgment but modify its terminology.

### BACKGROUND

Under the law, counties—generally the governmental entities that prepare for and conduct elections—can charge school districts for certain costs incurred in conducting elections for the districts. (See Elec. Code, §§ 10000, 23524; Ed. Code, §§ 5300, 5303, 5420-5426.) We will analyze these provisions later in this opinion.

In 1985, the County Clerk implemented a new two-part formula for billing election costs to school districts, community college districts and the County Office of Education (Districts) within its jurisdiction. The first part of the formula bills Districts for what County calls the "precinct costs" of conducting elections. According to County, "Precinct costs are those costs that bear the most direct relationship to balloting activities on election day." These costs include salary or labor costs for activities like: processing candidates' nomination papers; affixing labels to sample ballots; processing absentee ballot requests; assisting voters and supporting the polls on election day; manning the polls on election day; preparing the canvass and abstract of the vote after election day; ballot typing and ordering; preparing certificates of election; delivering poll supplies to election officers; setting up and removing election equipment at the polls; and ensuring security at the polls. In addition to these salary or labor costs, "precinct costs" include actual expenditures for items like: ballot and communication postage charges; forms for election officers and candidates; voter information pamphlets;

ballot and precinct supply kits; rental of polling facilities; publication of legal notices; computer time to create labels; and the printing of ballots.[1]

The second part of the formula bills Districts for what County calls "administrative costs." The primary item in administrative costs is the maintenance of voter files. This maintenance includes tracking registered voters, noting reregistration and purging the voting rolls as required by law. In addition to voter file maintenance, "administrative costs" include establishing and reviewing precinct lines; training poll workers; and maintaining poll sites.

"Administrative costs" are calculated by using County's elections office budget. In this manner, County computes the net cost of operating its election office for the fiscal year. The net cost is derived by taking the entire budget for the office and subtracting the anticipated revenues as well as certain prorated salary amounts for the County Clerk of Yolo County and the clerk's assistant (whose salaries are paid equally from the budgets of the Superior Court Clerk's Office, the recorder's office and the elections office). The remaining portion of the budget is then prorated among all entities holding elections in the county, using a proration method not in issue in this appeal.

Prior to 1985, County charged Districts only the "precinct costs" of an election. In 1985, the charge for "administrative costs" first appeared. As the parties state in their agreed statement of undisputed material facts, "In 1985 the County Clerk implemented a new billing system to charge school districts, community college districts and the County Office of Education the administrative costs for operating the elections office, in addition to the precinct costs historically recovered by the County."[2]

In 1985, County also began charging Districts for "administrative costs" when only one candidate filed for each elective office in a respective district. The parties in their agreed statement of facts stipulated that "[w]hen only one candidate files for each elective office in a district or for the County Board of Education for a particular scheduled election, no ballots are printed for that particular jurisdiction, no polling places are set up for that jurisdiction, no sample ballots are sent out for that jurisdiction, no balloting occurs

[1]These so-called "precinct costs" are not in issue in this appeal. Nothing in this opinion is to be construed as affecting charges for these costs.

[2]The issues in this case were resolved on cross-motions for summary judgment. For purposes of the cross-motions, the parties submitted an agreed statement of undisputed material facts. However, the parties also stipulated that this agreed statement was not intended to replace their respective separate statements of undisputed facts accompanying their motions for summary judgment.

for that jurisdiction, no ballots are counted for that jurisdiction for that scheduled election and the person takes office pursuant to Education Code sections 5326 and 5328." These administrative costs included computer time and salary expenditures for voter file maintenance as well as costs for miscellaneous supplies. Additionally, County billed in these circumstances for legal publication, ballot typing and ordering, and salary costs for processing papers.

This action began on July 14, 1989, when County filed a complaint against the Los Rios Community College District, the Esparto Unified School District and the Yolo County Board of Education. Specifically, the complaint alleged that these three school entities failed to pay their election bills arising from their respective board elections held on November 3, 1987. In its complaint, County sought damages and a declaration that its election billing methodology complies with applicable law.

Los Rios, Esparto and the Yolo Board answered the complaint and, joined by other school districts in the county, cross-complained against County. In this cross-complaint, Districts sought refunds for "overpayments" regarding the November 3, 1987, election and the November 1985 election.

In April of 1990, the parties filed cross-motions for summary judgment or summary adjudication of issues. On these motions, the trial court ruled: (1) Districts' claims for the 1985 overpayments are barred by the three-year statute of limitations in Code of Civil Procedure section 338; (2) the proration method used by County to calculate election costs is legally proper; (3) County cannot charge Districts for "administrative costs" but can charge for "precinct costs;" and (4) County cannot charge Districts for preparation costs regarding elections not held. The trial court entered judgment in line with these rulings. This appeal involves only the trial court's third and fourth rulings listed above.

DISCUSSION

1. *Standard of Review*

■ The issues in this appeal present questions of law involving statutory interpretation. As such, we are not bound by the trial court's decision and conduct an independent review. (See *Wallace v. Hibner* (1985) 171 Cal.App.3d 1042, 1045 [217 Cal.Rptr. 748].) ■ The principles which guide our review were summarized in *County of Fresno v. Clovis Unified School Dist.* (1988) 204 Cal.App.3d 417 [251 Cal.Rptr. 170] (*County of Fresno*), as follows: "The fundamental rule of statutory construction is that

the court should ascertain the legislative intent so as to effectuate the purpose of the law. To this end, every statute should be construed with reference to the whole system of law of which it is a part, so that all may be harmonized and have effect. [Citation.] Legislative intent will be determined so far as possible from the language of the statutes, read as a whole. If the words of an enactment, given their ordinary and proper meaning, are reasonably free from ambiguity and uncertainty, the court will look no further to ascertain the legislative intent. In the construction of a statute, the office of the judge is simply to ascertain and declare what is contained therein, not to insert what has been omitted, or to omit what has been inserted. However, courts will not infer a legislative intent that is capricious or unconstitutional if the statutory language admits of an alternative interpretation which would serve the statutory policy and render application of law reasonable and just. An absurd and unjust result will not be ascribed to the Legislature. [Citation.]" (204 Cal.App.3d at pp. 426-427.)

2. *Are the Costs County Designates as "Administrative Costs" in this Case Chargeable to Districts?*

There is an important matter of semantics we address before we begin our substantive analysis. The parties and the trial court framed the issues and their analyses on this question by using the term "administrative costs." As noted, this term was coined by County in its billing system for election costs. The term is not legally defined and has no independent legal significance. In light of the term's legally undefined and amorphous nature, we decline to employ it in this opinion. Instead, our focus will be on the following costs the parties have agreed are at issue in this regard: maintaining and purging registered voter files; establishing and reviewing precinct lines; training poll workers; and maintaining poll sites.

The general statutory framework regarding school district election costs can be summarized briefly as follows. Counties are required by statute to conduct elections on behalf of other governmental entities, including school districts. (Elec. Code, § 10000; see Ed. Code, § 5303; *County of Fresno*, *supra*, 204 Cal.App.3d at p. 427.) As pertinently provided in Elections Code section 10000: "All expenses, authorized and necessarily incurred in the preparation for and conduct of elections as provided in this code, shall be paid from the several county treasuries, except that when an election is called by the governing body of a city, the expenses shall be paid from the treasury of the city. All payments shall be made in the same manner as other county or city expenditures are made."

School district elections are subject to the Uniform District Election Law (hereafter UDEL). (Elec. Code, § 23500 et seq.) Elections Code, section

23524 in the UDEL, concerns reimbursement to counties for election costs and provides: "Each district involved in a general district election in an affected county shall reimburse such county for the actual costs incurred by the county clerk thereof in conducting the general district election for that district. The county clerk of the affected county shall determine the amount due from each such district and shall bill each such district accordingly." (See also Elec. Code, § 23503, in the UDEL, which defines "general district election" to mean an election held pursuant to the UDEL.)

Besides Elections Code sections 10000 and 23524, certain statutes found in the Education Code are relevant to the issue of school district election costs. As generally noted in Education Code section 5300, "School district elections and community college district elections shall be governed by the Elections Code, except as otherwise provided in this code." Reiterating the theme set forth in Elections Code sections 10000 and 23524, Education Code section 5303 provides in relevant part: "The county clerk or the registrar of voters, if such office has been established in the county, shall perform the duties incident to the preparation for, and holding of, all district elections."

■ Under this general statutory framework, a demarcation exists between the *preparation for* and the *conduct of* school district elections. (See *County of Fresno, supra,* 204 Cal.App.3d at pp. 427, 429.) Regarding costs, the defining principle is that school districts must pay counties for the "actual costs incurred" by the county clerk "in conducting" the school district's election. (Elec. Code, § 23524.) Under this scheme, the county cannot charge for the costs incurred in preparing for the school district's election. The court in *County of Fresno* highlighted this distinction in deciding that a county could not charge a school district for the costs incurred (staff salaries and computer time) in processing a recall petition and determining the petition was legally insufficient to require a recall election. (204 Cal.App.3d at pp. 420, 427, 429; see also Ed. Code, § 5424.)[3]

County asserts, however, that preparation costs are as necessary for the conduct of an election as are the costs incurred to actually carry out the balloting for the election. No doubt County is correct. Nevertheless, we think the preparation/conduct distinction—which is maintained in both the Elections Code and the Education Code—is important and meaningful, particularly when the more specific statutes on school district election costs are

---

[3]When a city, as opposed to a county, prepares for and conducts an election under Elections Code section 10000, analogous principles apply to the school district participating in that election. Thus, under Education Code section 5227, "The city shall be reimbursed by the [school] district or districts for its actual cost and expense incurred in the conduct of the election or elections."

considered. (See Ed. Code, §§ 5420-5426.) We must construe every statute with reference to the whole system of law of which it is a part, so that all may be harmonized and have effect. (*County of Fresno, supra,* 204 Cal.App.3d at p. 426.)

The more specific statutes on school district election costs are found in Education Code sections 5420 through 5426. (All further references to undesignated sections are to the Education Code unless otherwise specified.) The flagship of this group, section 5420, sets forth the kinds of election costs chargeable to a school district. Section 5420 provides: "The cost of any school district or community college district election may include, but need not be limited to: [¶] (a) Compensation of precinct election officers. [¶] (b) Publication of notices. [¶] (c) The cost of printing official ballots, sample ballots, indexes, arguments, statements, official notices, and card notices. [¶] (d) Mailing charges for card notices, arguments, recommendations, statements, and sample ballots. [¶] (e) Forms for rosters, tally sheets, certificates, envelopes, declaration of results forms, and legal forms required for bond elections. [¶] (f) Precinct maps. [¶] (g) The actual cost of supplies such as flags, ballot boxes, chairs and tables, booths, ink pads and stamps, and pencils; provided, that if any such can be borrowed from any state or county office, no charge for rental shall be included in the cost of elections."[4]

---

[4]Sections 5421 through 5426 set forth certain categories of school district elections that can be conducted and the method of payment for election costs regarding these categories. Those sections provide:

Section 5421: "The cost of any election held within a single district shall be borne by the entire district, and shall be paid out of its funds. Elections costs shall be determined by the county clerk or registrar of voters and approved by the county board of supervisors."

Section 5422: "The cost of elections, including consolidated elections, held in territory common to two or more districts shall be borne by the districts concerned in equal shares and paid from district funds."

Section 5423: "The cost of consolidated governing board elections shall be paid by the county superintendent of schools having jurisdiction from the county school service fund, and the cost shall be prorated among the districts concerned to reimburse the fund."

Section 5424: "The cost of any recall election shall be borne by the district in which the recall election is held and paid from district funds."

Section 5425: "The cost of the election for the formation of a community college district shall be paid from the county general fund."

Section 5426: "The cost of any election held under the provisions of Article 8 (commencing with Section 4400) of Chapter 2 of Part 3 of this division, or Article 7 (commencing with Section 35690) of Chapter 3 of Part 21 of Division 3 of Title 2, or Article 3 (commencing with Section 74630) of Chapter 5 of Part 46 of Division 7 of Title 3, where the election is being held for the assumption of bonded indebtedness of the district to which the territory is being transferred or where the county board of supervisors requires an election to be held in the whole district from which the territory would be transferred, shall be paid from the county general fund."

■ In line with the distinction between preparation costs and conduct costs set forth in Elections Code section 10000, Elections Code section 23524 and Education Code section 5303, the costs noted in Education Code section 5420 encompass the conduct side of the equation. (See *County of Fresno, supra,* 204 Cal.App.3d at p. 427.) That is, section 5420 covers those costs incurred in actually conducting a particular election. Using County's phrasing, section 5420 covers those costs "that bear the most direct relationship to balloting activities on election day," such as the costs of staging an election on election day. In other words, and again using County's phrasing, the kinds of costs delineated in section 5420 can be distinguished from the kinds of costs that involve "preparing for the regular cycle of elections" or that cover the ongoing, routine operations of County's elections office.

By far, the largest cost within County's so-called "administrative cost" is the maintenance of voter files. In fact, such maintenance (which includes tracking registered voters, noting reregistrations and purging ineligible voters from voter rosters) appears to be the main function of County's elections office when it is not actually conducting an election. But voter file maintenance does not appear in section 5420 and cannot be analogized to the costs that do appear there. County asserts the section 5420-listed cost "Forms for rosters" includes the maintenance of voter rosters. However, we think this listed cost supports rather than undermines our interpretation. It is not the *process* of maintaining accurate voter rosters which is included as a chargeable cost under section 5420. Rather, it is the *forms* for rosters which constitute such a cost. In short, forms for rosters involve costs directly related to balloting activities on election day rather than costs related to preparing for the regular cycle of elections or costs that cover the ongoing, routine operations of County's elections office. (See Elec. Code, § 14005.5.)

County also looks to the section 5420-listed cost of "Precinct maps" to argue the section encompasses County's so-called "administrative costs." Unlike the other cost references in section 5420, the reference to "Precinct maps" is cryptic. Again, however, the nuts-and-bolts conduct and balloting approach found throughout section 5420 implies that the chargeable cost encompasses the actual cost for the maps themselves rather than the costs incurred in preparing the maps. (See Elec. Code, § 1501.)

Nevertheless, we can envision a situation in which the cost for establishing and reviewing "Precinct maps" could be charged to a school district. An analysis of this situation illustrates our interpretive approach in this case. Under this approach, a school district is charged only for those election costs—as illustrated in section 5420—the county incurs because the school

district is participating in a particular election. If precinct lines have to be established and reviewed only because a school district(s) is participating in a particular election, that cost would be recoverable from the district(s) under the authority of section 5420, subdivision (f) ("Precinct maps") and Elections Code section 23524 (actual cost incurred by county in conducting district election). (See also Elec. Code, § 1513, governing the establishment of precinct boundaries.) If, however, precinct lines do not have to be specially prepared for a school district to participate in an election—for example, if the district can use the already established precinct lines that other governmental units use in the regular cycle of elections—that cost would not be chargeable to the district(s). (Elec. Code, § 10000; § 5303; *County of Fresno, supra,* 204 Cal.App.3d at pp. 427, 429.)

A related issue on this point involves County's so-called "administrative costs" of training poll workers and maintaining poll sites. To the extent these two costs are analogous to the kinds of nuts-and-bolts conduct and balloting costs listed in section 5420 (i.e., costs bearing the most direct relationship to balloting activities on election day such as the costs of staging an election on election day)—as opposed to being costs involved in preparing for the regular cycle of elections or costs involving the ongoing, routine operations of County's elections office—they may be charged to Districts. The method of charging could be akin to the prorated method employed by County regarding its so-called "precinct costs," a method not disputed in this appeal.[5] Of course, once again, if poll workers had to be trained or poll sites had to be maintained solely to accommodate a school district or school districts participating in a particular election—for example, where the only governmental entity involved in the election is the school district(s) and such training or maintaining is not part of the regular cycle of elections or part of ongoing, routine elections office operations—then the costs incurred by the county for these activities could be charged entirely to the district(s). (§ 5420; Elec. Code, § 23524.)

---

[5]In the summary judgment proceedings, the parties focused on the "administrative cost" of voter file maintenance and gave scant attention to the "administrative costs" of training poll workers and maintaining poll sites. Although these two latter costs, at least by their titles, appear to be analogous to the kinds of costs enumerated in section 5420, we are hesitant to categorize them as such on this record, particularly given County's characterization of them as "administrative costs." At one time, County defined "precinct costs" as "those charges incurred as part of election day activities" and defined "administrative costs" as "office expenses involved in preparing for the regular cycle of elections." Moreover, the county clerk in his deposition seemed to characterize the training of poll workers as more akin to an "administrative cost" than a "precinct cost." And a County press release regarding this suit spoke of "maintaining *regular* polling place sites." (Italics added.) In short, a clear fix on the costs of training poll workers and maintaining poll sites cannot be gleaned from the record before us.

County argues that the term "include, but need not be limited to" in section 5420 is a term of expansion rendering the section broad enough to encompass all of County's so-called administrative costs, including the maintenance of voter files. County is correct that the term is one of expansion. (See e.g., *Williams* v. *Kapilow & Sons, Inc.* (1980) 105 Cal.App.3d 156; 160 [164 Cal.Rptr. 176]; *State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.* (1977) 69 Cal.App.3d 884, 890 [138 Cal.Rptr. 509].) However, this does not mean the term is one of unlimited expansion. A canon of statutory construction—the doctrine of *ejusdem generis*—states that where general words relate to the enumeration of specific classes of things, the general words will be construed as applicable only to things of the same general nature or class as those enumerated. (See *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1390-1391 [241 Cal.Rptr. 67, 743 P.2d 1323]; *Peralta Community College Dist.* v. *Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 50 [276 Cal.Rptr. 114, 801 P.2d 357].)

In both *Dyna-Med* and *Peralta*, our high court construed a statute empowering the Fair Employment and Housing Commission to issue orders requiring employers or labor unions "to take *such action, including, but not limited to,* hiring, reinstatement or upgrading of employees, with or without back pay, and restoration to membership in any . . . labor organization, *as, in the judgment of the commission,* will effectuate the purposes of [the Fair Employment and Housing Act]." (Gov. Code, § 12970, subd. (a), italics added.) In *Dyna-Med*, the court used the doctrine of *ejusdem generis* to reason that the underscored part of the quoted statute did not authorize the Fair Employment and Housing Commission to award punitive damages. In *Peralta*, the court employed a similar approach regarding the commission's authority to award compensatory damages. (*Dyna-Med, supra,* 43 Cal.3d at pp. 1385-1391; *Peralta, supra,* 52 Cal.3d at pp. 48-51.)

As we have seen, the *kinds* of costs enumerated in section 5420 do not encompass the maintenance of voter files. Such maintenance is more in the nature of ongoing or routine preparation for the regular cycle of elections rather than the conduct of a particular election. (See Elec. Code, §§ 10000, 23524; see also § 5303.) Consequently, the cost incurred by County for maintaining voter files is not chargeable to Districts. The same is true for the cost of establishing and reviewing precinct lines unless that cost is incurred solely to accommodate a school district or school districts participating in a particular election. As noted before, to the extent that costs involved in training poll workers and maintaining poll sites are akin to the nuts-and-bolts conduct and balloting costs set forth in section 5420 (as construed herein),

they can be charged to Districts. The method of charging for such training or maintenance could follow the unchallenged (on appeal) prorated method currently used to charge for County's so-called "precinct costs" unless the costs of such training or maintaining are incurred solely to accommodate a school district or school districts participating in a particular election, in which case the district(s) could be charged entirely for these costs. If multiple school districts (but no other governmental entities) participate in such an election, then appropriate division of these section 5420-like training or maintaining costs amongst the districts would be required. (See §§ 5421-5423; see also fn. 5, *ante*.)

■ County disputes the applicability here of the *ejusdem generis* doctrine employed in *Dyna-Med* and *Peralta*. This dispute is grounded in the statutory language at issue. In *Dyna-Med* and *Peralta*, County argues, it was the general term "such action" that was at issue. By contrast, County asserts, the more precise term "the cost" is at issue here. According to County, the term "such action" does not have any meaning except by reference to illustrations whereas the term "the cost" has been regularly interpreted to include all costs. The short answer to this dispute is that if the term "the cost" had a precise and comprehensive legal definition, there would be no need for the statutes we are analyzing and no need for our analysis. In fact, the very statute to which the *ejusdem generis* doctrine applies—section 5420—would be unnecessary under County's position. It simply is not the case that when the term "the cost" is used in the abstract, all heads nod in agreement.

In related fashion, County cites two cases—*Fendrich* v. *Van De Kamp* (1988) 205 Cal.App.3d 537 [252 Cal.Rptr. 315] (*Fendrich*) and *San Diego Gas & Electric Co.* v. *San Diego County Air Pollution Control Dist.* (1988) 203 Cal.App.3d 1132 [250 Cal.Rptr. 420] (*San Diego Gas*)—to argue that courts have regularly construed the statutory term "the cost" to include administrative costs. Both of these cases, however, are inapposite and for the same reason.

At issue in *Fendrich* were regulations drafted pursuant to a provision of The Gaming Registration Act. (Bus. & Prof. Code, § 19800 et seq.) Those regulations required all persons owning an interest in a gaming establishment to pay an initial registration fee or an annual renewal fee. (205 Cal.App.3d at p. 539.) The statutory provision stated in pertinent part that registrants were to pay for the "actual, reasonable cost incurred in processing, investigating and approving or denying" the initial or renewal application. (Bus. & Prof. Code, § 19808; 205 Cal.App.3d at p. 539.) Under the

drafted regulations, administrative overhead expenses for training personnel, maintaining files, and preparing the annual budget were included as actual, reasonable costs for the application process. (205 Cal.App.3d at p. 542, fn. 4.)

The court in *Fendrich* rejected the appellants' contention that the fees under the regulations were excessive because they included these administrative costs. (205 Cal.App.3d at pp. 541-542.) The court noted that appellants had conceded the fees could include reasonably probable direct or incidental costs related to the administration of the regulatory program. (*Ibid.*) More importantly, the court found that under the statutory scheme the Legislature intended for the regulatory program to support itself through fees from the new and renewal applicants. In other words, said the court, the program was not meant to operate at the expense of the general taxpayers. (*Id.* at pp. 543-544.) To support this reasoning, the court noted that section 19818 of The Gaming Registration Act provided: " 'All fees, revenues, and penalties collected pursuant to this chapter shall be deposited in a special account in the General Fund to be available for expenditure by the Department of Justice [the department running the gaming registration program] to offset costs incurred pursuant to this chapter when appropriated by the Legislature therefor.' " (205 Cal.App.3d at p. 543.)

The statute at issue in *San Diego Gas* is similar in this regard. That statute—Health and Safety Code section 42311—originally provided that an air pollution control district board could adopt, by regulation, a schedule of fees not exceeding the estimated cost of issuing pollution permits and inspecting for such issuance. The statute was then amended to broaden the scope of what costs could be included in the fees. Under the amended statute, fees could be charged for evaluating, issuing and renewing permits to "cover the cost" of a district's programs. (203 Cal.App.3d at pp. 1137-1142.) As the court in *San Diego Gas* noted, "SDG&E and the district do not dispute that under the [original] statute the district could only charge fees to cover the costs directly pertaining to the permits, whereas under the [amended] statute, the district can now charge fees to cover all costs of its program, including indirect costs not related to a specific permit activity. The Legislature indicated its intent in the [amended] statute that the government's cost of administering the program be decreased and that systems be studied to determine whether fees could finance the districts." (*Id.* at pp. 1142-1143.)

The statutes at issue in *Fendrich* and *San Diego Gas* are not akin to the statutes we are construing. In those two cases, the statutes allow appropriate authorities to charge fees to private entities to cover the complete costs of

regulatory programs monitoring activities in which the entities are engaged. By contrast, the statutes at issue here make counties responsible for elections at the expense of general taxpayers except certain costs can be recovered by counties from governmental districts because of these districts' participation in the election. These distinctions are persuasive evidence that the term "the costs" cannot be read in the abstract but must be considered in the context of the statutory framework in which it appears.

■ County also argues that a county clerk is akin to an administrative agency charged with implementing a particular statute, and for that reason, we should defer to County's interpretation regarding "administrative costs." In somewhat related fashion, County also notes that its local government economics expert has opined in an unrebutted declaration that the word "costs" in the statutes before us encompasses the "administrative costs" County has charged Districts. With all respect to the county clerk and the County's economics expert, and assuming for sake of argument the county clerk is akin to a relevant administrative agency in this context, it is the ultimate responsibility of the courts to interpret these statutes and say what is the law. (*County of Fresno, supra,* 204 Cal.App.3d at p. 427; *Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 679 [170 Cal.Rptr. 484, 620 P.2d 1032]; *Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697].) As explained in *Morris,* "[w]hile the construction of a statute by officials charged with its administration . . . is entitled to great weight, nevertheless, '[w]hatever the force of administrative construction . . . final responsibility for the interpretation of the law rests with the courts.' [Citation.]" (67 Cal.2d at p. 748.)

As we have construed the applicable statutes, they present a coherent and harmonized whole. As part of their general functions, counties prepare for and conduct elections. (Elec. Code, § 10000.) When those elections involve governmental districts under the UDEL, such as school districts, counties can charge the districts for the actual costs incurred in conducting the election on the district's behalf. (Elec. Code, § 23524; §§ 5300, 5303.) Under section 5420, the actual costs incurred in conducting school district elections are those costs that are most directly related to balloting activities on election day as opposed to those costs incurred in preparing for the regular cycle of elections or those costs involving the ongoing, routine operations of County's elections office. A county can charge a school district the full section 5420 costs if only a single district is involved in the election; or, a county can charge the full section 5420 costs, appropriately divided, if the election involves more than one school district but no other governmental entities; or, a county can charge a prorated share of section 5420 costs if

a general governmental entity like a city, county, the state or the federal government is also participating in the election, using a method akin to the prorated method upheld by the trial court and not challenged here.[6] Election costs County would not have to incur *but for* Districts' participation in the election are chargeable to Districts. Stated another way, election costs County would have to incur regardless of Districts' participation in the election are not chargeable to Districts. Under this scheme, a county cannot charge a school district for the costs of election functions, activities or operations the county would have to undertake or engage in regardless of whether the school district was in the election.

A final point should be noted, and this point buttresses our conclusion. Apparently, there was no dispute regarding allocation of election costs prior to County's decision in 1985 to charge school districts under a new billing methodology that included the so-called "administrative costs." Before 1985, County charged Districts for only the so-called "precinct costs." The law did not change in 1985. (See Elec. Code, §§ 10000, 23524; §§ 5300, 5303, 5420-5426.) In fact, the same statutory scheme regarding election costs had been in existence for many years when County adopted its new billing system. (*Ibid.*) What had changed, and for the worse, was County's financial health. The new billing system coincided with a decline in County revenues. Accordingly, it was a financial rather than a legal engine that drove the new billing system. Under these circumstances, County's remedy lies with the Legislature, the only body that can change the applicable statutes. Until that body provides relief, County will have to assume its election duties as specified under those statutes and not shift its general function costs to other governmental entities.

3. *The Costs Incurred by County in Board Races Where There Is Only One Candidate Per Office*

The issue here is whether County may charge Districts for costs incurred where there is only one candidate per office. We conclude County may not do so.

Again, we start with the principle that a county may charge a school district for the actual costs incurred in conducting the "*election* for that

---

[6]Nothing in this opinion is meant to alter the trial court's unchallenged (on appeal) ruling that the apportioning of "precinct costs" on a pro rata basis, per voting opportunity, is a reasonable and proper interpretation of Elections Code section 23524. Nor do we disagree with the trial court that some chargeable costs can be assigned to a particular school district while other chargeable costs cannot be so assigned but have to be apportioned in some fashion (e.g., security of county voting headquarters on election night).

district." (Elec. Code, § 23524, italics added; see also Elec. Code, § 10000.) Under section 5420, "The cost of any school district or community college district *election* may include, but need not be limited to" the kinds of costs specified in section 5420. (Italics added.) Here, we deal with consolidated governing board races. Under section 5423, "[t]he cost of consolidated governing board *elections* shall be paid by the county superintendent of schools . . . and the cost shall be prorated among the districts concerned . . . ." (Italics added.)

The picture that emerges from our added emphases above is that there must be an "election" for there to be costs chargeable to a school district. However, as conceded by all sides, when only one candidate files for each school district office, the candidate takes office pursuant to sections 5326 and 5328. Section 5326 provides: "If, by 5:00 p.m. on the 83rd day prior to the day fixed for the governing board member election, only one person has been nominated for any elective office to be filled at that election, or no one has been nominated for the office, or in the case of members to be elected from the district at large, the number of candidates for governing board member at large does not exceed the number of offices to be filled at that election, or in the case of members to be nominated by trustee area and elected at large, the number of candidates do not exceed the number required to be elected governing board member at large nominated by that trustee area, or in the case of members to be elected at large in accordance with Section 5030.5, no more than one person has been nominated for each membership position, and a petition signed by 10 percent of the voters or 50 voters, whichever is the smaller number, in the district or trustee area, if elected by trustee area, requesting that a school district election be held for the offices has not been presented to the officer conducting the election, *appointment will be made as prescribed by Section 5328.* [¶] The provisions of this section and Section 5328 shall also apply to elections for membership on a county board [*sic*] of education." (Italics added.)

Section 5328 states: "If pursuant to Section 5326 *a district election is not held,* the qualified person or persons nominated shall be seated at the organizational meeting of the board, or if no person has been nominated or if an insufficient number is nominated, the governing board shall appoint a qualified person or persons, as the case may be, at a meeting prior to the day fixed for the election, and such appointee or appointees shall be seated at the organizational meeting of the board *as if elected at a district election.*" (Italics added.)

As the parties themselves concede in their agreed statement of facts regarding sections 5326 and 5328: "When only one candidate files for each

elective office in a district or for the County Board of Education for a particular scheduled election, no ballots are printed for that particular jurisdiction, no polling places are set up for that jurisdiction, no sample ballots are sent out for that jurisdiction, no balloting occurs for that jurisdiction, no ballots are counted for that jurisdiction for that scheduled election and the person takes office pursuant to Education Code sections 5326 and 5328."

■ Under sections 5326 and 5328, when there is only one person or candidate per school board office and no petition calling for an election has been presented, an election is not held because an "appointment" is made under section 5328. Since there is no election, it follows there are no election costs that a county can charge a school district in this situation because all of the applicable cost statutes speak in terms of there being an *election*. (Elec. Code, §§ 10000, 23524; §§ 5300, 5303, 5420-5426.) Indeed, there are certain costs incurred by a county when there is only one candidate, although the record before us shows they are relatively minor ones beyond the previously determined nonchargeable costs incurred in preparing for the regular cycle of elections and prorated to the district(s). In any event, as the trial court noted, the Legislature has put a condition precedent on recoupment of these costs and that condition is that an election must be held.

Support for this analysis is found in *County of Fresno*. The question in that case was whether costs incurred by a county clerk for staff salary and computer services could be charged to a school district for processing a school board recall petition that did not result in the holding of a recall election. (204 Cal.App.3d at pp. 420, 422.) The court said no based on the language of section 5424. Section 5424 provides: "The cost of any recall election shall be borne by the district in which the recall election is held and paid from district funds."

The court in *County of Fresno* reasoned as follows: " 'Election' is commonly defined as 'a choosing or being chosen for office by vote.' 'Hold' is commonly defined as 'to have or conduct together . . . carry on . . . perform.' (Webster's New World Dict. (2d college ed. 1982) pp. 449, 668.) . . . [¶] In our view, the language of Education Code section 5424 is clear and unambiguous and is susceptible of only one interpretation, what it says. To interpret this section as requiring districts within a county to pay costs expended by the county to determine that a recall election will not be held is to read into the section that which is not there, presumably because the Legislature so intended." (204 Cal.App.3d at p. 429.)

As in *County of Fresno*, the situation before us engenders salary and other processing costs but results in no election being held. (§§ 5326, 5328.) Of

course, we do not deal with section 5424 regarding the cost of recall elections. Besides sections 5326 and 5328, the statutes at issue here are found in sections 5422 and 5423. Section 5422 provides: "The cost of elections, including consolidated elections, held in territory common to two or more districts shall be borne by districts concerned in equal shares and paid from district funds." Section 5423 states: "The cost of consolidated governing board elections shall be paid by the county superintendent of schools having jurisdiction from the county school service fund, and the cost shall be prorated among the districts concerned to reimburse the fund."

County seizes on the fact that section 5423, unlike section 5424 construed in *County of Fresno*, does not contain the word "held." We think County seizes too much. First of all, section 5422, governing consolidated elections generally, contains the word "held." More importantly, the focus of section 5423 is on "[*t*]*he cost* of consolidated governing board *elections* . . . ." (Italics added.) In fact, all the statutes from section 5420 through section 5426 focus expressly on *the cost* of an *election.* As noted in *County of Fresno*, " 'Election' is commonly defined as '*a choosing or being chosen for office by vote.*' " (204 Cal.App.3d at p. 429, italics added.) However, as we have seen, an "election" does not take place under sections 5326 and 5328 unless a qualified petition submitted by voters requests one. In short, section 5423, specifying the method of payment for the cost of "consolidated governing board *elections*" (italics added), is irrelevant in the context of one-candidate races where no petition has been presented because in that situation an election does not occur under the procedure set forth in sections 5326 and 5328. Accordingly, County cannot charge Districts for the costs incurred pursuant to the (nonpetition) process of sections 5326 and 5328 because under that process there is no election.

County also notes that certain election costs enumerated in section 5420 are incurred "well before the County Clerk knows whether the election is contested or not." County cites but one example for this argument—publication of notices. (§ 5420, subd. (b).) However, this supposedly County-incurred cost is questionable in light of section 5325. Section 5325 is a companion provision to sections 5326 and 5328 and provides: "Any school district election or community college district election ordered to be held in accordance with the provisions of this code shall be called by the county superintendent of schools having jurisdiction of the election by causing the: [¶] (a) Posting or publication of notices of election, and [¶] (b) Delivery of a copy of the formal notice of election to the county clerk or registrar of voters at least 120 days prior to the date of the election." Under these provisions, it appears the school district rather than the county picks up the

tab for the publication of notices of election. This scheme makes sense. The district pays the costs incurred under section 5325 in calling an election. This cost is incurred whether an election is actually held or not. If an election is held, a county can seek proper reimbursement from a district pursuant to Elections Code section 23524, Education Code section 5420 and other relevant Education Code provisions as construed in this opinion. If an election is not held because sections 5326 and 5328 apply, a county does not incur chargeable costs.

County itself has echoed our views on this issue. In an October 22, 1987 letter to Yolo County Superintendent of Schools John Graf regarding races in trustee areas 3 and 4, County stated: "Inasmuch as there is only one candidate for each seat and a petition calling for an election has not been filed with this office an election will not be held. [¶] As specified in Education Code Section 5328, the persons nominated shall be seated at the organizational meeting of the board as if elected at a district election."

Our conclusion is consistent with the general theme we have woven in this opinion. That theme is that a county can charge a school district for only those section 5420-like election costs incurred by the county because the district is participating in a particular election. If sections 5326 and 5328 apply because no petition calling for an election has been presented, a school district does not participate in the election. Rather, "appointment" is made as prescribed in section 5328.

Accordingly, we conclude that when a person takes office pursuant to sections 5326 and 5328, County cannot charge Districts for any costs incurred in that process.

### CONCLUSION AND DISPOSITION

The election at issue here encompassed both a school district and a general governmental entity (city, county, state or federal government). This case, as presented on appeal, shows that the three so-called "administrative costs" besides voter file maintenance—i.e., establishing and reviewing precinct lines; training poll workers; and maintaining poll sites—would have been incurred in preparing for the regular cycle of elections or in carrying out routine elections office functions even if the school districts had not participated in the election. Accordingly, the trial court was correct in its judgment that County could not charge Districts here for these three costs. As explained previously, however, had the record shown that these three costs were incurred solely to accommodate a school district or school districts participating in a particular election or had the record shown that

training poll workers or maintaining poll sites constituted costs akin to section 5420, as construed herein, the result may have been different.

The judgment specifies that County is not legally entitled to recover from Districts "administrative costs" for scheduled elections and also uses the term "precinct costs." As explained in this opinion, we have rejected the unhelpful and amorphous labels "administrative costs" and "precinct costs" in favor of addressing each particular cost at issue. Accordingly, we modify the judgment to dispense with these two labels in accord with the views expressed in this opinion. In all other respects, the judgment is affirmed.

Blease, Acting P. J., and Nicholson, J., concurred.